**UNITED STATES, Appellee,**

v.

**James CURRY, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Frederick R. SILVESTRI, Sr.,
Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Frederick SILVESTRI, Jr.,
Defendant, Appellant.**

**Nos. 83–1662, 83–1664 and 83–1665.**

United States Court of Appeals,
First Circuit.

Argued Aug. 6, 1984.

Decided Dec. 26, 1984.

Ronald J. Chisholm, Boston, Mass., for defendant, appellant James Curry.

Anthony A. McManus, Dover, N.H., with whom Burns, Bryant, Hinchey, Cox & Shea, Dover, N.H., were on brief, for defendant, appellant Frederick R. Silvestri, Sr.

Michael R. Pizziferri, Boston, Mass., for defendant, appellant Frederick Silvestri, Jr.

Sydney Hanlon, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and PEREZ–GIMENEZ,* District Judge.

BOWNES, Circuit Judge.

In this narcotics conspiracy appeal, three of six original defendants urge that the district court erred in denying motions to suppress evidence seized from their private residences. Each of the three appellants, James Curry, Frederick Silvestri the elder (Silvestri, Sr.) and Frederick Silvestri the son (Silvestri, Jr.) was indicted for conspiracy to possess with intent to distribute, and possession with intent to distribute, more than 1000 pounds of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(6) and § 846. Curry claims that his hotel room was entered without a warrant in violation of the principles outlined in *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Both Silvestris claim that the warrantless entry and "securing" of their homes pending application for and arrival of a search warrant was violative of their fourth amendment rights. Silvestri, Jr. additionally urges that the police lacked probable cause to arrest him. All appellants waived a jury trial and were tried on stipulated facts. Because the factual background is complicated, we provide initially only an outline of the events which led to the contested seizures. Greater detail will be provided in the discussion of the issues.

I. FACTUAL BACKGROUND

In April 1983, Massachusetts State Police began court-ordered wire interceptions of two private residence telephones. These wiretaps provided information that led the police to believe Silvestri, Jr. and another codefendant, Anthony Rossi, who did not appeal, were involved in narcotics trafficking and that they were leaving town to obtain a shipment of drugs. Surveillance provided some corroboration of these suspicions. On Wednesday, April 28, 1982, at 3:15 a.m., a large rented Jartran truck arrived at Rossi's home, and later that same day it was moved to New Durham, New Hampshire, to property owned by Silvestri, Sr. Two residences were located on this property and the entire property was placed under surveillance. It was later found that Silvestri, Sr. and his family made their home in the single family dwelling, and Dianne Silvestri, Silvestri, Jr.'s estranged spouse, resided in an apartment over the garage/barn.

On Thursday morning, April 29, at 3:00 a.m., two pickup trucks arrived initiating a flurry of activity. Lights flashed on and people were seen on the grounds, although no identifications were possible. The record does not indicate whether persons emerged from both residences, or only one. That afternoon, Silvestri, Sr. left the property and was tailed by police as he drove to Alton, New Hampshire. There he met James Curry, Joseph DiPersia, and Frances Petrone, all of whom were later charged as codefendants in the conspiracy. After a forty-minute discussion at a bar, the four men returned to the Silvestri property in New Durham, with Curry a passenger in Silvestri, Sr.'s car and the other two men in a white Pontiac.

Later that same evening, it appeared to police that the Jartran truck previously seen at Rossi's was being loaded at the Silvestri property. The truck thereafter left the Silvestri property with Rossi and Silvestri, Jr. in the cab. The white Pontiac followed the truck with all the men who had met in Alton earlier that day except for Silvestri, Sr. Upon arrival at the Leominster, Massachusetts Holiday Inn, all five men went inside.

At approximately 10:00 p.m., Sergeant Brown of the New Hampshire State Police walked to the rear of the Jartran truck and recognized the odor of marijuana. Other officers on the scene confirmed that the truck smelled of marijuana. A few minutes later, Petrone emerged from the Holiday Inn and moved the truck. He was then followed by the police to Room 124 of the hotel. Male voices could be heard inside the room from the hallway.

Four men left the hotel at approximately 11:00 p.m. and moved the white Pontiac

* Of The District of Puerto Rico, sitting by designation.

immediately next to the Jartran truck. They gathered at the trunk of the car and were observed talking, and then the four drove off in the Pontiac. The car was stopped a short distance away and the occupants, later identified as Silvestri, Jr., Rossi, DiPersia, and Petrone, were arrested.

Approximately two hours later, at 1:00 a.m., officers from the New Hampshire and Massachusetts State Police forces went to Room 124 of the Holiday Inn and arrested James Curry. Sergeant Brown, who had surveilled the meeting in Alton, recognized Curry as one of the men at that meeting when he joined the others three to five minutes after the entry was made. The officers, upon entering, detected the odor of burning or burnt marijuana inside the room and they observed an open briefcase. The briefcase was seized and held pending authorization of a search warrant.

At 9:30 a.m. that same morning (April 30), Massachusetts State Police executed a search warrant for the Jartran truck in the Holiday Inn parking lot. They found 102 bales of marijuana. A search warrant was also issued for the white Pontiac, and two blocks of hashish, a prescription bottle with the name of Frederick Silvestri, and a small amount of marijuana were seized.

After Curry was arrested in Leominster, but before the Massachusetts search warrants were executed for the truck and briefcase, the New Hampshire State Police entered and "secured" the Silvestri residences pending application for and arrival of a search warrant. This warrantless entry occurred at approximately 3:00 a.m. The search warrant arrived at 11:30 a.m. The police seized 99 bales of marijuana in the garage/barn, a truck registered to Silvestri, Sr. containing 1489 pounds of hashish (estimated street value of $1.75 million), and a ledger listing bales of marijuana which corresponded to the marked bales discovered in both the Jartran truck and the Silvestri garage, and identical to a ledger later discovered in Curry's briefcase. The officers also seized tide charts, a passport belonging to Silvestri, Jr. and a small

amount of marijuana from the residence of Dianne Silvestri. A search of Silvestri, Sr.'s home yielded another block of hashish. Before his arraignment, Silvestri, Sr. is alleged to have admitted that he had driven one of the pickup trucks bringing in the "dope" and that he had helped to offload some of the bales.

## II. CURRY'S APPEAL

██ Curry presents two interrelated issues for review: whether the district court erred in ruling that the police had sufficient probable cause to make either a warrantless arrest or a warrantless search of his hotel room, and whether the police had probable cause to search his briefcase. He claims that insufficient evidence was before the district court for these rulings to be made. The relief Curry requests is a remand for rehearing and appropriate findings regarding the circumstances under which police entry was made into his hotel room. Contrary to the Government's position, we find that these issues were adequately raised below and are not on that basis barred from review.

██ As noted, Curry stipulated to certain facts and thereafter was convicted at a bench trial. These stipulations, which the Government cosigned, included the following:

> On April 30, 1982, at approximately 1:00 a.m., Sergeant James Jajuga and Corporal Henry Carpenito went to Room 124 of the Holiday Inn, Leominster, and arrested James H. Curry. *Sergeant Brown went to secure the back and joined the others 3–5 minutes later.* Curry was the same man whom Sgt. Brown had observed in Alton, New Hampshire with Frederick Silvestri, Sr. *The officers, upon entering, detected a strong odor of burning or burnt marijuana inside the room, and they observed an open briefcase. The briefcase was seized and held pending execution of a search warrant.* [Emphasis added.]

The district court found that "[w]hen Sergeants Jajuga and *Brown* knocked on the door of Room 124, a man answered. Ser-

446

geant Brown recognized the man as one of the people who met Silvestri, Sr. at the pub in Alton, New Hampshire" (emphasis added). Nothing in the record of Curry's case supports the court's findings that after the police knocked, the door was voluntarily opened, and that Sergeant Brown was in the original group when Curry's room was entered. These findings were clearly erroneous.[1]

■ And they were not harmless error. Curry contends that he did not consent to the police entry and that his room was forcibly entered with no authorization via a warrant. Moreover, it is not clear that adequate probable cause existed to justify an arrest of the occupant of Room 124 or to search the room prior to the identification of Curry by Sergeant Brown three to five minutes after the entry by the other officers.

■ The district court specifically declined to hold an evidentiary hearing as requested by Curry. We are, therefore, faced with a blank record on critical issues. We do not know whether, after the police officers knocked on the door of Room 124[2], the door was voluntarily opened or whether the police forcibly entered. If the latter, we do not know whether they sought to make a warrantless search, to secure the premises pending arrival of a search warrant, or to arrest the unknown occupant or occupants. From the stipulations, it appears that the police inquired at the registration desk and discovered Room 124 to have been registered to James Curry two hours *after* the entry and arrest. Nor did the district court rule whether exigent circumstances were present, a determination which would have great bearing on whether the police actions were constitutional. Because we do not know why and how the room was entered, we cannot determine whether the doctrine of *Welsh v. Wisconsin,* — U.S. —, 104 S.Ct. 2091, 80

L.Ed.2d 732 (U.S.1984) (warrantless nighttime entry of home to arrest for a civil, nonjailable offense [*e.g.,* simple possession of marijuana] prohibited by fourth amendment), *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 23 L.Ed.2d 639 (1980) (absent probable cause and exigent circumstances, warrantless arrests in the home are prohibited by fourth amendment), *United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (fourth amendment does not prohibit pursuit of arrestee inside the home where arrestee had earlier been in a public place not procured by police—doorway of her home—and had retreated following shout of "police"; "hot pursuit" requirement met), *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (where no probable cause to arrest until police entered hotel room and found defendant the sole occupant, search cannot be sustained as incident to valid arrest; Government cannot at same time justify an arrest by a search and a search by an arrest), or other rules apply. *Cf. New Hampshire v. Morse,* 480 A.2d 183 (N.H.1984) (discussing doorway arrests under fourth amendment). We must vacate Curry's conviction and remand for an evidentiary hearing on these issues and specific findings by the district court. At the hearing, the district court should consider whether the doctrine of pooled knowledge applies. "The cases that have addressed this question have consistently held that the existence of probable cause is to be evaluated on the basis of the collective information of the law enforcement officers engaged in a particular investigation." *United States v. One 1975 Pontiac Lemans, Vehicle I.D. No. 2F37M56101227,* 621 F.2d 444, 449 (1st Cir.1980); *see also* 1 W. LaFave, *Search & Seizure* § 3.5.

## III. SILVESTRI, SR.'S APPEAL

Of the three appellants, the case of Silvestri, Sr. presents the most difficult legal

---

**1.** These findings are almost a verbatim recitation of the pertinent stipulation the two Silvestris signed; this was not an admissible stipulation in Curry's case, however, which was tried separately.

**2.** At oral argument, Curry stated that he did not contest that police knocked, only that they entered without his permission. We assume that he took the same position in the district court.

questions. He challenges the denial of his motion to suppress evidence gathered from his New Hampshire property for several reasons: inadequate probable cause for a search warrant; execution of a defective warrant owing to deliberate police misstatements in the supporting affidavit and because it authorized an overly broad search; and unattenuated taint of the seized evidence owing to police exploitation of their fourth amendment violation—a warrantless entry. Silvestri, Sr. further urges that the district court erred in denying his motion to suppress statements he allegedly made to police following what he contends to have been an unlawful arrest and a tainted search. We begin with a review of the pertinent facts.

## A. *The Illegal Entry and Seizure*

Between 3:00 a.m. and 3:30 a.m. on April 30, 1982, New Hampshire State Police went to the two Silvestri residences in New Durham with the purpose of "securing the premises" pending the arrival of a search warrant. At the time the six armed and uniformed police officers arrived, no lights were on and there was no visible activity inside the homes or on the grounds. Apparently the police knocked, although this is not clear from the record before us, and then, without permission, entered both Silvestri residences. All the occupants were awakened and the police announced that the premises were being "secured," *viz.,* seized, pending arrival of a search warrant. A "security check" was then performed, with the police fanning out through the dwellings to ensure no other persons were inside. Several small children were allowed to leave. All five adults were prohibited from leaving and were, in effect, taken into custody in their own homes with no authorization pursuant to either an arrest or search warrant. One adult was prevented from leaving for work.

Almost eight hours after the homes were initially entered and seized, a search war-

rant was issued by a state court; it arrived at 11:30 a.m.

The police continued to occupy the residences and detain the residents until the search was concluded. At that time, approximately eleven hours after the initial entry and detention, Silvestri, Sr. was formally placed under arrest and the other occupants were released. Several hours later, Silvestri, Sr. allegedly admitted to police that he had actively participated in the drug distribution activity.

The district court ruled that the warrantless entry into the Silvestri dwellings and the detention of residents was "illegal and inexcusable," and that it could not be justified by exigent circumstances. It further held that the search warrant affidavit did not contain any facts derived from the illegal entry and, therefore, the evidence seized pursuant to the warrant was not tainted.

This case is controlled by *Segura v. United States,* — U.S. —, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). The question in *Segura* was

> whether, because of an earlier illegal entry, the Fourth Amendment requires suppression of evidence seized later from a private residence pursuant to a valid search warrant which was issued on information obtained by the police before the entry into the residence.

*Id.* at —, 104 S.Ct. at 3380 (footnote omitted). The Court specifically held

> that where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

*Id.* at —, 104 S.Ct. at 3383 (footnote omitted).[3] The Court further held

3. It is not altogether clear exactly how much of the opinion's holdings a majority of the Justices

joined. While this quoted holding is stated in Part I of the opinion where all the rulings are

that the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319] (1920).

*Id.*[4]

█ Like *Segura,* here the police engaged in a fourth amendment seizure after illegally entering the two Silvestri residences in order to "secure" the homes from within. The entry was illegal under the fourth amendment because it occurred in the absence of consent, exigent circumstances, or a valid warrant. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Coolidge v. New Hampshire,* 403 U.S. 443, 474–78, 91 S.Ct. 2022, 2042–44, 29 L.Ed.2d 564 (1971); *United States v. Edwards,* 602 F.2d 458, 468 (1st Cir.1979).

█ The evidence secured during the search conducted pursuant to the later-acquired search warrant need not be suppressed, however, because probable cause to search existed even before the illegal entry by the police.[5] Thus, "the warrant and the information on which it was based were unrelated to the entry and constituted an independent source for the evidence." *Segura,* —— U.S. at ——, 104 S.Ct. at 3383. The information that the police had prior to the entry, as recited in the warrant affidavit, established: (1) On April 28, 1982, Massachusetts State Trooper Joseph Brooks re-

quested New Hampshire State Police to begin a surveillance of "the Silvestri residence" on Davis Cross Road in New Durham, New Hampshire. (2) Trooper Brooks had received information "from a reliable source that Frederick Silvestri" and Rossi were involved in a conspiracy to sell and distribute large quantities of marijuana. (3) A Jartran rental truck with a specific tag number had been observed first at Rossi's residence in Wrentham, Massachusetts, and later "at the residence of Frederick Silvestri, Davis Cross Road, . . . ." (4) At approximately 3:00 a.m. on April 29, two pickup trucks were seen entering the yard "of the Silvestri residence" and were not observed leaving; the troopers reasoned that they had been stored in the large garage or barn which had an apartment above. (5) At 4:30 p.m. that afternoon, the troopers saw "Frederick Silvestri leaving his residence" and observed him travelling to a meeting with persons in a 1982 Pontiac. (6) The Pontiac then followed the Silvestri vehicle back "to his residence." (7) At approximately 7:30 p.m. that same night, the same Jartran truck and the Pontiac were seen "exit[ing]" the Silvestri residence" and were tailed to the Holiday Inn in Leominster, Massachusetts. (8) The occupants of both vehicles went to Room 124 in the Inn. (9) Shortly after 10:00 p.m., a male subject emerged from the Holiday Inn and moved the truck before reentering the motel. (10) Twenty minutes later, the affiant and two other officers who went to the truck recognized the odor of marijuana emanating from its rear. (11) At 11:15 p.m., the 1982 Pontiac left the Holiday Inn parking lot with four males inside and was stopped by Massachusetts troopers a few hundred yards from the hotel. (12) The occupants, Francis Petrone, Joseph DiPer-

---

summarized, and a note states that "Justice White, Justice Powell, and Justice Rehnquist join all but Part IV of this opinion," *Segura* at ——, 104 S.Ct. at 3380 **, its reasoning appears in Part IV, which only the Chief Justice and Justice O'Connor joined.

**4.** A clear majority of the Court joined the discussion and holding governing an independent source in these circumstances.

**5.** We need not decide if evidence obtained after the illegal entry, but causally unrelated thereto, may be used to establish probable cause, as there was sufficient pre-entry evidence for that purpose.

sia, Anthony Rossi, and "Frederick Silvestri, Davis Cross Rd., New Durham, New Hampshire,". were placed under arrest for violations of the state drug laws. (13) At 1:00 a.m. on April 30, Sergeant Jajuga and Corporal Carpenito went to Room 124 of the Holiday Inn and arrested James Curry, who was alone in the room. The officers noticed a strong odor of burning or burnt marijuana and saw a plastic bag in plain view which they believed to contain approximately one ounce of marijuana.

We think that this information was sufficient for probable cause under the "totality of the circumstances" test set forth in *Illinois v. Gates*, 462 U.S. 213, 241, 103 S.Ct. 2317, 2334, 76 L.Ed.2d 527 (1983).

The *Segura* holding limited the time period of warrantless possession of the premises by the police to "no more than the period here involved," which was nineteen hours. The warrant for the search of the Silvestri premises arrived eight hours after the entry, well within the *Segura* limits.

The third test of *Segura* was also met. While the police were preserving the status quo at the Silvestri premises, "others in good faith" were "in the process of obtaining a warrant."

The only issue before the Court in *Segura* was "whether drugs and the other items not observed during the initial entry and first discovered by the agents the day after the entry, under an admittedly valid search warrant, should have been suppressed." — U.S. at ——, 104 S.Ct. at 3385. The Court, in *Segura*, carefully refrained from deciding whether items in plain view seized prior to the arrival of the warrant were admissible as evidence. It pointed out that the Second Circuit had ruled that the "initial warrantless entry was not justified by exigent circumstances and that the evidence discovered in plain view during the initial entry must be suppressed" and "[n]o review of that aspect of the case was sought by the Government and no issues concerning items observed during the initial entry is before the Court." *Id.*

Because the question of the admissibility of plain view evidence is still open and because there must be a remand on other grounds, we think the district court should determine if there were any plain view items introduced into evidence and, if so, specify them. Until such findings, a ruling by us on the plain view issue would be premature.

**B.** *The Conflation of Father and Son in the Affidavits*

■ Finally, Silvestri, Sr. urges that the police deliberately failed to distinguish between father and son in the search warrant affidavit, making it appear that there was only one, not two, Frederick Silvestris, in order to aggregate the appearance of probable cause and assure the authorization of a search warrant. The district court held that "the failure to distinguish between father and son was very misleading, and created the impression that the owner of the premises to be searched was deeply involved in drug traffic." It correctly turned to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), but did not hold an evidentiary hearing to determine either the accuracy of the challenged statements or the state of mind with which they were made because it found the allegedly false statements were not necessary to the finding of probable cause. Unfortunately, the problem on review is that the court did not specify which statements, or portions of statements, he excised as a predicate to his ruling.

The Government admits that the affiant, Officer Carpenito, conflated the activities of Silvestri, Sr. with those of his son; it did not concede that this was deliberate or in reckless disregard of the truth, or that it was done because the activities of either of them alone would not have provided probable cause for a search warrant for the two residences. The problem with this explanation is that all of the activities used in the affidavit to obtain a search warrant for Silvestri, Sr.'s home were those of his son, who did not live on the premises. The Massachusetts State Trooper, Joseph Brooks, who had provided a great deal of the information in the affidavit knew that

Silvestri, Jr. did not live at his father's home because he had been watching Silvestri, Jr.'s home in Norwood, Massachusetts. In his own affidavit filed in support of search warrants for the Jartran truck, James Curry's briefcase, and all the other Massachusetts warrants, Trooper Brooks states that "Frederick Silvestri" of "170 Summer Street, Norwood," was thought to be leaving town to obtain a shipment of drugs. Nowhere in the Carpenito affidavit is this fact acknowledged. The only activity of Silvestri, Sr. recited in the Carpenito affidavit is that he went to a bar and had a drink with several men who were subsequently arrested, and returned to his home from the bar with one as a passenger in his car. The Jartran truck was not seen anywhere near Silvestri, Sr.'s home but, instead, the whole time it was on the premises, it was parked beside the home of the son's estranged wife, one hundred fifty feet from that of Silvestri, Sr. The misleading quality of the Carpenito affidavit is highlighted by a comparison of the Brooks and the Carpenito affidavits: the one time Brooks recites facts pertaining to Silvestri, Sr., he refers to him as a "single male" who goes to a bar and returns. Brooks never attributes this activity, as did Carpenito, to a composite "Frederick Silvestri." It seems plain that the police did know that there were two, not one, Frederick Silvestris.

Because of the conflation of the Silvestris in the affidavit for the search warrant, there must be a remand for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674.

### C. *The Statements of Silvestri, Sr.*

■ Silvestri, Sr., also seeks to have statements he made to the police suppressed as "fruit" of an illegal arrest and illegal search. The statements were made after the warrant arrived at Silvestri premises and after his formal arrest.[6] Since, under *Segura,* the evidence seized after the arrival of the warrant was not suppressed as "fruit" of the illegal entry, it follows

---

6. There is no *Miranda* problem.

that statements made to police after the warrant arrives and an arrest is made are admissible evidence.

 Of course, if, after the *Franks* hearing, the warrant is found to be invalid, the statements would be inadmissible as "fruit" of an illegal search and seizure.

■ We find no merit in Silvestri, Jr.'s claim that the police lacked probable cause to stop the white Pontiac, in which he was a passenger with Petrone, DiPersia, and Rossi, after it left the Holiday Inn. We agree with the district court that the Government amply demonstrated probable cause under *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317.

*Affirmed in part. Reversed in part. Remanded for further proceedings consistent herewith.*

*The conviction of Curry is vacated.*