UNITED STATES of America, Appellee,

v.

**Raul Casiano FIGUEROA, Defendant, Appellant.**

No. 86–1298.

United States Court of Appeals, First Circuit.

Argued April 1, 1987.

Decided May 15, 1987.

Charles W. Rankin, by Appointment of the Court, with whom Rankin & Sultan, Boston, Mass., was on brief, for defendant, appellant.

Victor A. Wild, Asst. U.S. Atty., with whom Robert S. Mueller, III, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, BREYER and SELYA, Circuit Judges.

SELYA, Circuit Judge.

The Secret Service, an arm of the federal Department of the Treasury, is entrusted with the primary responsibility for policing the integrity of the nation's money supply. Not impressed by the old saw that imitation is the sincerest form of flattery, the Service maintains an unending vigil to halt trafficking in homemade currency. In the course of such duties, agents of the Secret Service crossed the path of Raul Casiano Figueroa, the defendant-appellant herein. The tale follows.

## I

In the autumn of 1984, the Secret Service conducted an investigation into certain reported sales of counterfeit currency in the Boston area. During this investigation, one Leland Richards unwittingly sold some $800 worth of fake twenty dollar bills to an undercover Secret Service agent, Kenneth Bradshaw, on November 9, 1984. Richards was arrested on the spot. Caught with his hand in the cookie jar, he agreed to cooperate with the authorities in a collaborative effort to trace the origins of the simulated greenbacks.

Richards's turnabout boded ill for the appellant, as the recreant lost little time in giving sworn statements which implicated Figueroa[1] in a scheme to distribute some $20,000 in counterfeit notes. Specifically, Richards identified the defendant as the individual he had witnessed agreeing to supply yet another trafficker, Alcides Contreras-Perez, with large quantities of the funny money. A confidential informant corroborated this aspect of Richards's story. And, both she[2] and Richards furnished the Secret Service with specimens of the bills which they claimed to have obtained (independently) from Contreras-Per-

---

1. The trial record reflects, and appellate counsel confirmed at oral argument, that (contrary to the more usual hispanic custom) the appellant chooses to use the last of his given names as his surname. We will, therefore, honor his nomenclative preference and refer to him as "Figueroa."

2. The gender of the anonymous informant was revealed during a pretrial hearing on defendant's motion for suppression.

ez. The samples of the illegal tender proved to be identical.

Richards's cooperation with the government was not limited to telling what he knew; he also placed telephone calls to Figueroa, and arranged for Bradshaw to meet with the defendant for the express purpose of negotiating a sale of the scrip. This rendezvous occurred on November 13 at Figueroa's home. At that time, the appellant agreed to sell counterfeit currency to Bradshaw, insisting only that the transaction be facilitated through Richards.

Two days later, Figueroa directed Richards to join him at Kay's Garage in Dorchester, Massachusetts. They met inside the garage at approximately 6:00 p.m. on that date. Surveillance was in place. When a car bearing the pair left the garage (with Figueroa driving), a cadre of lawmen stopped the vehicle. Surrounded by government agents and police officers (some with weapons drawn), but without any prompting or questioning, Figueroa spontaneously exclaimed that he knew all about the spurious twenty dollar bills and volunteered his cooperation in the ongoing investigation.

The appellant was then given *Miranda* warnings (which he acknowledged having understood) and taken to the nearby Secret Service office for interrogation. He neither requested counsel nor invoked his known right to remain silent. To the exact contrary, he made a number of incriminating statements concerning his role in a series of illicit counterfeit-related transactions. These oral statements were recorded and later reduced to writing. The written summary, which included a further recital of the defendant's *Miranda* waiver, was read to Figueroa and thereafter given to him to review. He signed it, vouching for its accuracy. The sum and substance of the narrative was that Figueroa had obtained $20,000 in ersatz twenties from a Los Angeles source, one Santiago, in October 1984. Once back in Boston, the appellant allocated equal amounts of the bogus bills to Contreras-Perez and Richards, respectively. Each consignee was to pay Figueroa $2,000 in genuine coin of the realm.

During his initial stay at the Secret Service office (which lasted for some two hours), Figueroa claimed to be working as a private investigator on behalf of the Carribean Detective Agency in Puerto Rico. (This myth was later exploded—and abandoned by the appellant—when the agents contacted the Carribean Detective Agency directly and established that Figueroa's employment was but a figment of his fertile imagination.) He reaffirmed his desire to assist the agents, and offered to give them easy access both to Santiago and to a local counterfeiting sachem, Leo Venuti. In furtherance of Figueroa's suggestion, Ron Malfi, a Secret Service agent, drove him to Venuti's home in Braintree, Massachusetts that very evening. There, appellant introduced Malfi as an associate from Los Angeles interested in purchasing counterfeit. During this session, Venuti explained that he was familiar with the bills from California that Figueroa and Contreras-Perez possessed, and boasted that his own counterfeit was better. The meeting ended with a tentative agreement for Venuti to wholesale some of this "superior" merchandise to Figueroa and Malfi on November 17.

Figueroa went home that evening a free man, having agreed to return to the Secret Service office the following day. He did so return, but discontinued his cooperation abruptly when his requests for money and immunity (not necessarily in that order of priority) were spurned.

In March 1985, the grand jury returned the instant indictment against Figueroa to the United States District Court for the District of Massachusetts. The indictment charged conspiracy to possess and deal in counterfeit currency, 18 U.S.C. §§ 371, 472, 473, along with two substantive counts of possession, 18 U.S.C. § 472, and dealing, 18 U.S.C. § 473. All of the accusations related to the defendant's activities with Richards and with an unnamed individual (subsequently identified as McArthur Sullivan) during October and November of 1984.

Prior to trial, the appellant moved to suppress the statements he had made to the agents on November 15, claiming that

there was no probable cause for what he viewed as his "arrest" and that the statements obtained were, therefore, impermissibly tainted. After an extensive pretrial hearing, the district court refused suppression. The court found that, although Figueroa's detention on November 15 was tantamount to an arrest, the government had ample cause to apprehend him.

In February 1986, Figueroa's trial commenced. The prosecution presented a string of witnesses who corroborated and amplified the facts which we have recounted. In addition, the aforementioned McArthur Sullivan testified pursuant to a grant of immunity. The meat of Sullivan's testimony was that Contreras-Perez had introduced him to Figueroa (then using the alias "Tony") in the summer of 1984; that he and Figueroa had several contacts thereafter; and that, in October 1984, Figueroa telephoned to inform him that "something" had been left in a Saab at the garage where Sullivan worked. According to the witness, his subsequent search of the Saab's trunk revealed a green plastic bag containing almost $30,000 in counterfeit currency.

The jury, apparently persuaded beyond any reasonable doubt that the bills were bogus and the criminality authentic, returned guilty verdicts on all counts. Figueroa was thereafter sentenced and claimed this appeal. We affirm.

## II

The appellant's principal assignment of error concerns the district court's denial of his motion to suppress the inculpatory statements which he made to the agents on November 15, 1984. His claim is that, when the Secret Service stopped his car and confronted him, the agents effectuated what amounted to a warrantless arrest, not supported by probable cause. It follows, he contends, that the statements which the Service obtained from him thereafter were forbidden fruits of a tree poisoned by a fourth amendment violation, and should have been quashed. In denying the defendant's motion to suppress, however, the district judge agreed with the defendant's

premise only in part; he found that, although the agents' actions amounted to a custodial arrest (as Figueroa asserted), the apprehension was nevertheless lawful inasmuch as it was bottomed on a surfeit of probable cause.

The government strives mightily on appeal, as it did below, to cast Figueroa's detention in the mold of an investigatory "stop" within the meaning of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The matter is not free from doubt. *Compare Dunaway v. New York*, 442 U.S. 200, 206–26, 99 S.Ct. 2248, 2253–64, 60 L.Ed.2d 824 (1979) *with United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 1573–76, 84 L.Ed.2d 605 (1985). *See generally United States v. Quinn*, 815 F.2d 153 (1st Cir.1987). Yet, we need not troll in such windswept seas. Assuming (albeit without deciding) that the appellant's detainer was in the nature of an arrest, as he argues, the district court's finding that the probable cause requirement of the federal Constitution was satisfied seems unimpugnable.

We begin by noting that the constitutionality of a warrantless arrest "depends ... upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). *Accord United States v. Ayres*, 725 F.2d 806, 809 (1st Cir.), *cert. denied*, 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984). Probable cause is determined under an objective standard, *United States v. McCambridge*, 551 F.2d 865, 870 (1st Cir.1977), and the government need not show "the quantum of proof necessary to convict." *United States v. Miller*, 589 F.2d 1117, 1128 (1st Cir.1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). Probability is the touchstone: "[p]robability, and not a prima facie showing, of criminal activity is the standard of

probable cause." *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983) (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)). *Accord United States v. Wiseman,* 814 F.2d 826, 828 (1st Cir.1987). As the Court emphasized in *Gates:*

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*Illinois v. Gates,* 462 U.S. at 231–32, 103 S.Ct. at 2328–29 (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Thus "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.,* 462 U.S. at 232, 103 S.Ct. at 2329. *Cf. United States v. Curry,* 751 F.2d 442, 446 (1st Cir.1984).

With these guidelines as our lodestar, we must look to the totality of the circumstances known to the Secret Service as night fell on November 15, 1984. It is settled, of course, that our scrutiny of the district court's finding in this regard is governed by the clearly erroneous rule, *Wiseman,* at 827–28; *United States v. Moore,* 790 F.2d 13, 15 (1st Cir.1986); *United States v. Veillette,* 778 F.2d 899, 902 (1st Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986); *United States v. Baldacchino,* 762 F.2d 170, 175 (1st Cir.1985), and that not all lawful explanations of the situation must be negated, *United States v. Viegas,* 639 F.2d 42, 45 (1st Cir.), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981). Furthermore, the expertise of the law enforcement officers—here, skilled and experienced Treasury agents with highly specialized knowledge of the counterfeiting "industry"—must also be taken into account in our assessment of the matters at hand. *See United States v. McHugh,* 769 F.2d 860, 865 (1st Cir.1985).

■ The district court found "abundant probable cause" for Figueroa's arrest, and a reasoned review of the record leaves scant room for any dubiety. At a minimum, the Treasury agents knew that fake twenties had begun appearing with unhappy regularity in the Boston area; they had received mutually corroborating accounts, fingering Figueroa, from a brace of informers (one disclosed and one confidential); they had listened to recorded telephone conversations in which the defendant arranged to meet with a known dealer in bogus bills under suspicious circumstances; they had confirmed that the arranged meeting actually took place; and one agent had overheard the defendant agree to sell counterfeit currency to a third party. This, we think, was, comfortably, more than enough.

That the events involving Figueroa did not all transpire in exactly the manner prophesied by Richards does not, as appellant urges, so undermine the informant's credibility as to have made reliance thereon unreasonable in fourth amendment terms. We believe it to be significant that much of what Richards told the Secret Service was independently corroborated in key particulars from other sources. What is more, in telling the tale Richards incriminated himself—a fact which betokened and furthered his reliability. *See United States v. Harris,* 403 U.S. 573, 583–84, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723 (1971). Most importantly, "[t]hough an informant's trustworthiness should be carefully assessed by a police officer, there is no requirement that the tipster be letter perfect in every particular." *United States v. Chapdelaine,* 616 F.Supp. 522, 527 n. 2 (D.R.I.1985), *aff'd mem.,* 795 F.2d 75 (1st Cir.1986). *See generally Gates,* 462 U.S. at 233–35, 103 S.Ct. at 2329–30. The indicia of reliability which attended Richards's incrimination of Figueroa were too staunch to be dissipated by relatively minor inaccuracies.

In this case, the information available to the Secret Service at the time in question was sufficiently trustworthy and particularized to substantiate the government's thesis that Figueroa had been, and was, engaged in criminal counterfeiting transactions. Accordingly, the district court's determination that probable cause existed in ample measure when Figueroa was collared and that defendant-appellant was not arrested in derogation of the fourth amendment cannot be branded as clearly erroneous. From aught that appears, the denial of the suppression motion was fully warranted.

### III

Figueroa next maintains that the statements he made at the Secret Service office on November 16 (the day after his initial detention) should not have been admitted into evidence. He posits this assignment of error on an ingenious (if somewhat anfractuous) argument that the arresting agents neglected to bring him before a magistrate "without unnecessary delay" in contravention of Fed.R.Crim.P. 5(a).[3] *See Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). The unusual circumstances of the juxtaposition between Figueroa and the Secret Service—the "stop" which may or may not have been an arrest, the defendant's uncoerced decision to cooperate fully, his volunteered visit to Venuti's home (with agent Malfi in tow), and his return to the agents' office the next day as promised—could conceivably have made the Rule 5(a) point arguable. But, we need not cross that bridge—for the defendant utterly failed to raise this contention below. "[A]n issue not presented to the trial court cannot be raised for the

first time on appeal." *United States v. Argentine*, 814 F.2d 783, 791 (1st Cir.1987) (quoting *Nogueira v. United States*, 683 F.2d 576, 580 (1st Cir.1982)). *See also* Fed. R.Crim.P. 12(f) (party's failure to object tantamount to waiver); *United States v. Bennett*, 364 F.2d 499 (2d Cir.1966) (objection to post-arrest delay "must be made at the latest at the time of trial, and perhaps even earlier") (quoting *D'Ercole v. United States*, 361 F.2d 211, 212 (2d Cir.1966)), *cert. denied*, 386 U.S. 917, 87 S.Ct. 876, 17 L.Ed.2d 789 (1967); *United States v. Miller*, 293 F.2d 697, 698 (2d Cir.1961) ("proper time to object to the failure to bring an accused before a [magistrate] without unnecessary delay is at trial when the government offers in evidence the fruits of a period of illegal detention").

█ In this state of the record, we review the issue which Figueroa seeks belatedly to raise only for plain error. The point does not come close to approaching this benchmark; it is by no stretch of the imagination a matter "so shocking [as to] seriously affect the fundamental fairness and basic integrity of the proceedings conducted below," *United States v. Griffin*, 818 F.2d 97, 100 (1st Cir.1987). Thus, the Rule 5(a) question is not properly before us. *United States v. Kobrosky*, 711 F.2d 449, 457 (1st Cir.1983).

### IV

Figueroa's claim that the district court erred in failing to make findings vis-a-vis the existence and scope of the counterfeiting conspiracy for purposes of determining the admissibility of coconspirators' statements, *see United States v. Petrozziello*, 548 F.2d 20 (1st Cir.1977), and in thereafter admitting the testimony of McArthur Sullivan under Fed.R.Evid. 801(d)(2)(E),[4] is

---

3. Fed.R.Crim.P. 5(a) provides in pertinent part: [A]ny person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available federal magistrate or, in the event that a federal magistrate is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3041. If a person arrested without a warrant is brought before a magistrate, a complaint shall be filed forth-

with which shall comply with the requirements of Rule 4(a) with respect to the showing of probable cause.

4. Fed.R.Evid. 801(d)(2)(E) provides, in general, that a statement offered against a party is not to be deemed hearsay if it is one made "by a coconspirator of [the] party during the course and in furtherance of the conspiracy."

flawed in much the same manner as the previous assertion. *See supra Part III.* The record makes it excruciatingly plain that at no time before, during, or after the trial did the defendant object to the proffer of Sullivan's testimony. No request was made that the district judge make *Petrozziello* findings. Notwithstanding what appellate counsel now urges, trial counsel—for what may well have been sound tactical reasons—appears deliberately to have bypassed such a defense stratagem.

■ The point not having been raised, it has not been preserved for appeal. After all, the *Petrozziello* rule is designed to protect the integrity of the trial in borderline situations where the prosecution may or may not be able to muster sufficient proof of the existence, scope, shape, and duration of an alleged conspiracy. If the defendant elects not to put the government to this test—either for tactical reasons or because the outcome, realistically, is foreordained—he is in a poor position to complain after the fact. As we stated in *United States v. David E. Thompson, Inc.*, 621 F.2d 1147, 1153 (1st Cir.1980), "[i]n the absence of proper objection, Fed.R.Evid. 103(a)(1), a deviation from the standard announced in *Petrozziello* will be reversed only upon a showing of plain error." Inasmuch as any error in admitting the Sullivan testimony without formal *Petrozziello* findings was at worst marginal, appellant's procedurally defaulted claim fails to clear the high hurdle posed by the plain error standard. *See United States v. Griffin*, at 100.

V

Figueroa's last assault upon the verdict protests the admission, over objection, of agent Malfi's testimony. In substance, Malfi testified that the defendant arranged for him to meet with Leo Venuti, a suspected wholesaler of counterfeit currency. The trio met at Venuti's home, with Malfi posing as a prospective purchaser of the mock money. The district court allowed the agent to describe this meeting—an encounter which resulted in a tentative agreement for the sale of counterfeit. According to

Malfi, Venuti and Figueroa engaged in extended discussion of the counterfeiting arts, during which Venuti, with peacock pride of craftsmanship, vaunted the superior quality of his goods as compared to Figueroa's. (Venuti explained, for example, that his notes had more extensive serial numbers than the California-made currency which Figueroa and Contreras-Perez possessed, and would thus be "easier to pass.")

Appellant's theme is that the district court should have excluded Malfi's statements as hearsay, because the meeting was one arranged at the behest of the Secret Service following Figueroa's apprehension and during the period of his cooperation. Thus, the appellant contends, any statements made during the meeting were no longer in furtherance of the criminal conspiracy. Up to a point, we agree. Venuti's remarks could not be considered as statements made to advance the conspiracy, and were not admissible in evidence under Fed. R.Evid. 801(d)(2)(E). *See supra* n. 4. But, that is as far along this particular road as we can accompany the defendant—for we concur in the trial judge's conclusion that the statements did not qualify as prohibited hearsay.

■ The Federal Rules teach that only out-of-court declarations offered "to prove the truth of the matter asserted" constitute hearsay. Fed.R.Evid. 801(c). Statements proffered to show something other than the accuracy of their contents—to show, say, the knowledge or state of mind of the declarant or one in conversation with him—are not considered hearsay. *E.g.*, VI *Wigmore on Evidence* § 1789 at 235 (3d ed. 1940) (utterance offered to demonstrate third person's state of mind in consequence of the utterance admits of "no assertive or testimonial use ... and ... is therefore admissible, so far as the Hearsay rule is concerned"). As the drafters of the Federal Rules aptly observed, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed.R.Evid. 801(c) advisory committee note.

■ In the case at bar, the record adequately evinces that Malfi's testimony con-

cerning Venuti's statements was not aimed at establishing the veracity of those remarks. Indeed, the truth or falsity of what Venuti is alleged to have said—*e.g.*, that his counterfeit was of better quality than Figueroa's, that it would be easier to pass, etc.—was altogether immaterial to the case and to the purpose for which the evidence was introduced. Rather, Malfi's testimony was offered as evidence of the defendant's knowledge of, and sophistication in, the counterfeiting industry.[5] *See McCormick on Evidence* § 250 at 741 (3d ed. 1984) ("Proof that one talks about a matter demonstrates on its face that he was conscious or aware of it, and veracity does not enter into the situation."). *Cf. United States v. Rubin*, 591 F.2d 278, 283 (5th Cir.), *cert. denied*, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979) (in prosecution for embezzling union funds, defendant's testimony about what other union officers had told him concerning the meaning of the union's constitution ought to have been admitted not for the truth of the matters asserted, but as evidence relevant to defendant's state of mind). The trial judge carefully and correctly instructed the jurors on the limited (non-assertive) uses which could be made of agent Malfi's testimony. Based on what the witness reported as the content of the conversation between Venuti and Figueroa, and consistent with the court's charge, the jury could permissibly have drawn inferences about appellant's understanding of the counterfeiting enterprise, his state of mind in conducting himself as he did with, *inter alia*, Richards and Sullivan on prior occasions, and his level of involvement with counterfeiting in general. Accordingly, it was not an abuse of discretion for the district court to conclude that these non-truth-of-the-matter purposes brought Malfi's testimony out of the exclusionary ambit of the hearsay rule, and to admit the evidence.[6]

---

**5.** The relevancy of such knowledge can hardly be gainsaid, given that all three of the offenses with which the defendant was charged were crimes which required specific intent.

**6.** Since Malfi's testimony was not hearsay and was thus properly before the jury, we need not pass on the government's claim that the evidence was also admissible under Fed.R.Evid.

## VI

To recapitulate briefly, we find that the Secret Service agents had probable cause to detain Figueroa on November 15, 1984; that no legally cognizable basis has been shown for suppressing the inculpatory statements which he made that evening and on the following day; and that the district court did not err in admitting into evidence the testimony of either Sullivan or Malfi. We likewise find that, in the absence of any proper or timely request by the defendant, the lack of *Petrozziello* findings does not constitute reversible error in this case. The asseverations hawked by the appellant are, without exception, meritless.

We need go no further. Figueroa's conviction must stand.

*Affirmed.*

---

801(d)(2)(B) (because Venuti's statements constituted adoptive admissions on the part of the defendant). *Cf. Onujiogu v. United States*, 817 F.2d 3, 5 (1st Cir.1987) (so long as evidence properly admitted, precise legal theory undergirding admissibility is of no moment).