UNITED STATES of America

v.

Jose C. HIDALGO, Jose R. Hijos, et al.

CR. No. 90–004–WF.

United States District Court,
D. Massachusetts.

Aug. 31, 1990.

Joseph M. Walker III, Robert L. Ull-
mann, U.S. Attys. Office, Boston, Mass.,
for U.S.

John LaChance, Framingham, Mass.,
James F. Oineen, Boston, Mass., John C.
Doherty Jr., Andover, Mass., Daniel D.
Gallagher, South Boston, Mass., for defen-
dants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Defendants Jose C. Hidalgo and Jose R.
Hijos, along with co-defendants Alejandro
Host and Jesus Echemendia, were arrested
on December 8, 1989 and indicted on Janu-
ary 4, 1990 for possession of cocaine with
intent to distribute and distribution of co-
caine in violation of 21 U.S.C. § 841(a)(1),
and conspiracy to possess cocaine with in-
tent to distribute and distribution of co-
caine in violation of 21 U.S.C. § 846. Hi-
dalgo was also indicted for use and car-
riage of a firearm in connection with a
narcotics transaction in violation of 18
U.S.C. § 924(c). Defendants Hidalgo and
Hijos have moved to suppress the fruits of
a search of Hijos' apartment at 16 James
Street in Malden, Massachusetts, including
2,039 grams of cocaine, two scales, $9,290
in United States currency, assorted person-
al papers and documents, a firearm belong-
ing to Hidalgo, and various incriminatory
statements made by Hidalgo upon his ar-
rest at the apartment. Defendants contend
that the entry and search of the apartment
were not pursuant to a validly issued war-
rant, were not supported by probable cause
or exigent circumstances, and were in vio-
lation of the "knock-and-announce" require-
ment of 18 U.S.C. § 3109.

The court held an evidentiary hearing on
this motion to suppress on June 18 and 19,
1990 (the "Suppression Hearing"). The
court heard testimony from Special Agent
Pedro Velazco of the Drug Enforcement
Administration (the "DEA"), Special Agent
Thomas D'Ambrosio of the Bureau of Alco-
hol, Tobacco and Firearms, Sergeant Peter
Murphy of the Brookline Police Depart-
ment, Special Agent John Fencer of the
DEA, Special Agent Feliz Muollo of the
DEA, Officer Alfred DiSalvo of the Metro-
politan District Commission Police, Ronald
Colantonio, the building superintendent for
16 James Street, and the defendant, Jose
Hidalgo.

For the reasons stated below, the court
finds that the law enforcement officials
violated 18 U.S.C. § 3109 in entering Hijos'
16 James Street apartment without knock-
ing, that Hidalgo's post-arrest statements
must be suppressed as the fruit of an il-
legal warrantless entry and arrest, and
that the physical evidence obtained from
the apartment is nevertheless admissible
under either the independent source or in-
evitable discovery exceptions to the exclu-
sionary rule.

## I. FINDINGS OF FACT

Upon consideration of the evidence
presented, including an assessment of the
credibility of the witnesses, the court finds
the facts of this case as follows.

The recently formed Boston Drug Task
Force (the "Task Force") is a 23-agent unit
composed of officers and agents from the
DEA and other federal, state and local law

enforcement agencies. In the fall of 1989, the Task Force began an investigation into the narcotics transactions of defendant Jesus Echemendia. On November 13, 1989, a DEA confidential informant ("CI"), working under the supervision of Agent Fencer, a 20–year veteran of the DEA who had previously worked with the CI in an investigation in August, 1989, purchased one-eighth of a kilogram of cocaine from defendants Echemendia and Host at the A & T Auto Repair Shop in Dorchester. The cocaine was approximately 50% pure.

On December 8, 1989, the CI again went to the A & T Auto Repair Shop, at approximately 1 p.m., to purchase a second one-eighth kilogram quantity of cocaine. The CI had been equipped with a body transmitter and was under surveillance by Fencer and other members of the Task Force.

Shortly after arriving at the repair shop, the CI left with Echemendia and another man, later identified as defendant Hijos. They drove in Hijos' car from the repair shop to a Store 24 in Malden. Hijos made a carphone call during the trip, in which he instructed another party to leave a second automobile for him at the Store 24. Hijos subsequently exchanged cars and car keys with a Hispanic male, later identified as defendant Hidalgo, in the parking lot of the Store 24. The automobile switch was observed by the surveilling agents, although only the CI, and not the agents, saw defendant Hidalgo.

Hijos then drove Echemendia and the CI to a nearby parking lot adjacent to a five-story apartment building at 16 James Street in Malden. The trio entered the apartment building and went to Apartment 14, where Hijos opened the door with a key. Hijos retrieved a plastic bag from a closet near the bathroom and placed four wrapped packages, equal in size, from the bag on the dining room table. Hijos opened one package, showed some white powder to the CI, rewrapped the package, and placed it inside his coat.

The three men left the apartment approximately ten minutes after entering. As they left, they encountered Hidalgo in the hallway. Hijos told the CI that Hidal-go was his cousin and instructed Hidalgo to put away the packages which had been left on the dining room table.

Through their monitoring of the CI's body transmitter, the supervising agents knew that the three men had left the apartment. However, they did not see the three men exit nor could they locate their vehicle. The agents consequently drove back to the auto repair shop, arriving before the CI and the two defendants, who returned at approximately 2:45 p.m. The CI then climbed into his car and was followed from the area by the agents.

The CI told Fencer what had transpired at the Store 24 and the apartment. He also told Fencer that he had arranged to purchase one kilogram of cocaine from Echemendia and Hijos at the Church's Fried Chicken on Dorchester Avenue in 45 minutes. The agents provided the CI with the necessary money and he subsequently called Echemendia, and agreed to meet him at 3:45 p.m. At the same time, Fencer contacted Agent Velazco, the supervisor of the Task Force, by radio and told him that an arrest was imminent.

At approximately 3:45 p.m., the CI exchanged the money for a kilogram of cocaine. He gave a pre-arranged signal following the transaction and the Task Force agents moved in. The agents arrested Hijos and Echemendia and retrieved a one-kilogram package of white powder which field-tested positive for cocaine.

Fencer advised Velazco of the arrest by radio and suggested that Velazco take some agents to the 16 James Street location, conveying to him briefly the observations of the CI and the events of the day. Fencer himself returned to the Task Force headquarters and, in conjunction with an Assistant United States Attorney, began preparing an affidavit and other materials to obtain a search warrant for the 16 James Street premises. The warrant would ultimately be approved by the magistrate at approximately 8:45 p.m. that evening.

Based on the information he received from Agent Fencer, Velazco left the Task Force headquarters at approximately 4:45

p.m. and proceeded to 16 James Street in Malden. He took a number of agents from the office with him and was met by others who had been involved in the earlier surveillance and arrests. In all, approximately 15 law enforcement officers were on the scene when Velazco arrived between 5:15 and 5:30 p.m. After a short conference, Velazco ordered most of his men into the building and directed them to break down the door to Apartment 14 with a battering ram. Velazco also positioned a few of his men outside the building to prevent anyone from escaping through an apartment window.

At the Suppression Hearing, Velazco testified that he decided to enter and secure the apartment prior to issuance of a warrant to prevent the possible destruction of evidence, particularly the three kilograms of cocaine which the CI had said were left on the dining room table. His decision to use the battering ram without first knocking on the door, however, was grounded primarily on concern for the safety of his agents. Although the Task Force included several experienced officers and agents, it had never before conducted a search or raid as a unit, and Velazco was uncertain of how well or safely they would perform together. Velazco was concerned that someone in the apartment might be armed, although he had no specific information suggesting this possibility. Velazco did not hear any noise emanating from the apartment, nor did he have any reason to believe that anyone inside the apartment was in danger. In addition, the battering ram was new and the Task Force was anxious to try it out.

As the agents struck the apartment door with the ram, they shouted "Police." The first strike put a one-foot diameter hole in the door. The second or third strike opened it. The officers rushed into the apartment with their weapons drawn. They immediately encountered defendant Hidalgo who was coming into the living room from one of the two apartment bedrooms. His hair was uncombed, his clothes were in disarray, and he had obviously been awakened by the commotion. Hidalgo was taken into custody by Agent Muollo

while the rest of the agents conducted a brief protective sweep to look for other individuals who might be in the apartment.

Hidalgo was handcuffed and informed of his *Miranda* rights in English. He indicated that he understood them. Velazco asked Hidalgo if he wanted to cooperate and Hidalgo replied that he did not know what was going on. Velazco then left Hidalgo on the living room sofa with Muollo without questioning him further.

At this point, the testimony concerning events at the 16 James Street apartment begins to conflict. Velazco testified that he instructed his agents not to search the apartment for drugs or other evidence until they received word from Fencer that a warrant had been issued. Velazco was still in periodic contact with Fencer through either his radio or the telephone of an off-duty DEA agent who happened to live downstairs in the apartment building. The agents sought to keep themselves occupied in various ways. Agent D'Ambrosio tried to break the code on a portable phone which he states he found, along with an instruction manual, on the dining room table. Officer Murphy took several photographs of the apartment. Several agents watched a videotape of the previous night's prizefight which they found on top of the television. Velazco sent some agents out for beer and food for the men, which the agents drank and ate while waiting for the warrant. All the agents testified that no search other than the protective sweep occurred prior to issuance of the search warrant.

Velazco further testified that about 15 minutes after he initially questioned Hidalgo, at approximately 6 p.m., Muollo told him that Hidalgo wished to speak with him. According to Velazco, Hidalgo asked how he could help himself and, when Velazco responded that any cooperation would be brought to the attention of the prosecuting attorney, Hidalgo stated that he wanted to cooperate. Velazco then informed Hidalgo of his *Miranda* rights again, in English and Spanish, and the two proceeded to talk for about an hour. Although Velazco did not take any notes during their conversa-

tion, Hidalgo subsequently gave a second statement to Muollo, who took notes and later prepared a report on Hidalgo's admissions.

Velazco testified that early in his conversation with Hidalgo, the defendant informed him that he had left a loaded firearm under the mattress in the bedroom in which he had been sleeping. Velazco directed Agent D'Ambrosio to unload the firearm, but otherwise leave it in place, which D'Ambrosio did. Officer Murphy testified that he took photographs of the firearm at this time. Hidalgo also told Velazco that a substantial amount of money was secreted in the stereo cabinet and that two one-kilogram packages of cocaine were hidden in the linen closet near the bathroom. Velazco testified that he had Murphy open the cabinet and photograph the money immediately, but that he told the agents not to search the linen closet for fear of having the narcotics suppressed. Murphy, who left the apartment no later than 6:30 p.m., denied having photographed either the money or the two packages of 99% pure cocaine which were at some time found in the closet. D'Ambrosio, on the other hand, testified that he photographed both items after the warrant was approved.

According to Velazco and the other agents, they received word from Fencer that a warrant had been issued sometime between 8:30 and 9:00 p.m. They then proceeded to search the apartment thoroughly, with Officer DiSalvo acting as the recorder for the search. In this capacity, DiSalvo was supposed to record the location of seized items and which officer found them. In addition to the firearm, the money in the stereo cabinet and the cocaine in the closet, the search uncovered plastic bags and tape in the closet, money in a gym bag in the bedroom, record books in the living room, and two scales and a small 39 gram package of 60% pure cocaine in the kitchen. DiSalvo testified that approximately twenty minutes after the search had begun, while waiting in the kitchen for other items to be discovered, he found the electronic digital scale and the small bag of cocaine himself, when he looked on top of one of the kitchen cabinets. The search

was completed around 10 p.m., approximately one-half hour after Fencer actually arrived with the warrant. The agents all left together, taking Hidalgo in for booking and locking the apartment door behind them.

To the contrary, defendant Hidalgo testified that, upon entering the apartment, the Task Force agents threw him to the ground and stripped and searched him, before allowing him to redress, cuffing him and putting him on the couch. He says the agents then began thoroughly searching the apartment. He also claims the officers emptied out the refrigerator, stove and food closet, searched behind the refrigerator, took the cover off the living room air conditioner, and apparently moved furniture and other items in the bathroom and bedrooms. According to Hidalgo, they took the portable phone from the bedroom, along with an instruction booklet which was in the drawer of a bedside table. They searched Hidalgo's clothes, which were in the gym bag in the bedroom. In addition, they apparently searched two cars belonging to Hijos which were parked in the adjacent lot. Hidalgo also testified that he was locked in the bathroom for approximately fifteen minutes at some time around 6:30 p.m., and then was put back on the sofa.

According to Hidalgo, he did not volunteer cooperation with the agents until after they had confronted him with the two packages of cocaine from the closet and the handgun from the bedroom. By Hidalgo's testimony, all or almost all of the physical evidence was found by 6:00 to 6:30 p.m., more than two hours before the warrant was approved.

Hidalgo's version of events is supported by the testimony of Ronald Colantonio, the building superintendent at 16 James Street. Colantonio stated that he saw individuals with flashlights looking into Hijos' car when he arrived home between 5:30 and 6:00 p.m. on December 8. He further testified that two law enforcement officers took him upstairs to look at the door to Apartment 14 at approximately 6:30 p.m. He spent about five minutes at the door, never going more than a few feet into the apart-

ment. At that time, he stated, the refrigerator had been pulled out from the wall and the cover had been removed from the living room air conditioner.

Colantonio returned to fix the door between approximately 8:30 and 9:00 p.m., but was told by the agents to return in a half hour. He ultimately fixed the door some time between 9:00 and 10:00 p.m. He spent about a half hour on this project, during which time he noticed that debris was scattered on the floor of the kitchen and that the air conditioner cover was still missing.

The court is not completely persuaded by any single witness's version of the events at 16 James Street. On the one hand, the court does not believe that the Task Force agents simply sat in defendant's apartment for three hours waiting for a search warrant to issue. Indeed, their own testimony suggests that the officers engaged in at least some "poking around." They discovered that defendants had taped the previous night's fight and, apparently with Hidalgo's permission, they took defendants' beer from the apartment refrigerator. D'Ambrosio testified that he spent the better part of two hours trying to break the code on the portable telephone, which the court believes was retrieved, along with its manual, from the apartment bedroom. DiSalvo's statement that he personally found the digital scale and small package of cocaine, even though he was supposedly occupied recording the discoveries of other officers, also casts doubt on the testimony that no search occurred prior to the issuance of the warrant. Finally, Velazco himself, whose testimony the court largely credits, admitted that he ordered the stereo cabinet opened to expose the money following his conversation with Hidalgo, before the issuance of the search warrant. The court thus finds that the totality of the evidence suggests that at least some search and seizure took place, in a haphazard fashion, prior to issuance of the warrant, and that the agents themselves are not entirely certain of what items were seized when.

On the other hand, the court credits Velazco's testimony that he instructed his agents not to search the apartment and attempted to prevent them from doing so. More importantly, the court also believes the testimony of Velazco and the other agents that the cocaine in the hall closet was not viewed, photographed and seized until after the warrant issued. Velazco demonstrated an appreciation for the potential consequences of an illegal search and the court is not persuaded that he would lightly risk the suppression of important evidence when he reasonably believed a warrant was forthcoming. Moreover, the court believes Velazco, a 13–year veteran of the DEA, would not have allowed Hidalgo's continued presence in the living room, if he and his agents were conducting an illegal search. Finally, if the agents had conducted a full search immediately upon entering the apartment, and in particular if they had found the additional kilograms of cocaine at that time, the court does not believe all ten or twelve of them would have continued to sit around Hidalgo's apartment for four hours on a Friday night waiting for the warrant to be approved. Based on these factors and the testimony of the various agents at the Suppression Hearing, the court concludes that no thorough search of the apartment occurred prior to issuance of the warrant and, in particular, that the cocaine was not seized, that the furniture and appliances were not moved, and that the cover was not removed from the air conditioner prior to that time.

The court acknowledges Ronald Colantonio's objectivity and credibility as a witness, but believes he was confused or mistaken in stating that he saw the refrigerator pulled out and the air conditioner cover pulled off during his first visit to the apartment. More likely than not, Colantonio saw these things either during his second visit to the apartment, which would have coincided with the height of the post-warrant search, or during his third visit, when he actually fixed the door.

As explained below, however, it is, as a matter of law, immaterial which precise items of physical evidence were seized pursuant to an illegal pre-warrant search and which were discovered during the lawful post-warrant sweep. The eventual is-

suance of a valid warrant renders the former items admissible under the inevitable discovery exception to the exclusionary rule while the independent source doctrine permits admission of the latter. On the other hand, the court concludes that Hidalgo's statements to Velazco and Muollo are not admissible because of the agents' violation of the "knock-and-announce" rule during their warrantless entry, without regard to whether his admissions were prompted by confrontation with illegally seized evidence.

## II. CONCLUSIONS OF LAW

To decide this Motion to Suppress, the court must address whether:

1) The warrantless entry at 16 James Street was supported by probable cause and exigent circumstances;

2) The entry was nevertheless invalid because of the forceful nature of the entry;

3) Assuming the entry was illegal, Hidalgo's post-arrest statements must be suppressed; and

4) Assuming the entry was illegal, the physical evidence found in the apartment must be suppressed, or is admissible under the independent source or inevitable discovery exceptions to the exclusionary rule?

The court concludes that the initial entry of the apartment violated the "knock-and-announce" statute, 18 U.S.C. § 3109, and that Hidalgo's statements must therefore be suppressed as the fruit of an illegal, warrantless entry into the residence. However, the subsequent issuance of a valid search warrant permits admission of the physical evidence under either the independent source or inevitable discovery doctrines, regardless of whether the items were discovered prior to the issuance of the warrant or not.

A. *It is Doubtful that the Warrantless Entry Was Supported by Exigent Circumstances*

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 477, 91 S.Ct. 2022, 2043, 29 L.Ed.2d 564). "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* 445 U.S. at 590, 100 S.Ct. at 1382.

A warrantless entry into a home for purposes of search or arrest must be justified by both probable cause and exigent circumstances. *United States v. Moore,* 790 F.2d 13, 15 (1st Cir.1986). In this case, there is no doubt that the probable cause requirement was met. The Task Force agents had been informed by the CI that he had seen three packages of white powder in the apartment approximately three hours before. The CI's veracity and the reliability of his information were supported both by past experience and by his success in setting up the November 13 and December 8 transactions. The CI had heard Hijos instruct Hidalgo to put the packages away, presumably in the closet from which they came. A fourth package from the apartment had field-tested positive for cocaine. Under these circumstances, the Task Force agents could make "a practical, common-sense decision" that "given all the circumstances, there [was] a fair probability that" cocaine and other evidence of drug-trafficking would be found in the apartment. *See United States v. White,* 766 F.2d 22, 25 (1st Cir.1985) (probable cause to search existed where dealer, seen leaving target premises, was arrested carrying less than the three kilograms of cocaine which she had promised to deliver).

However, the court doubts that there existed sufficient exigent circumstances to justify a warrantless entry. The government contends that the Task Force agents reasonably believed that Hidalgo would flee or destroy the evidence if they did not secure the apartment shortly after Hijos' arrest. Agent Velazco believed that Hidalgo might get nervous if Hijos did not return from Boston within the time required

to obtain a warrant. However, Velazco based this belief on his knowledge and assumptions about the behavior of drug-traffickers in general. He did not have any particular information that Hidalgo was nervous, that he expected Hijos back at any particular time, or that he would likely be informed by others of Hijos' arrest.

■ The government has the burden of proving exigent circumstances. *United States v. Baldacchino*, 762 F.2d 170, 176 (1st Cir.1985). As the Court of Appeals for the First Circuit has stated:

> In determining whether the circumstances of a case fall into one of the emergency conditions characterized as exigent circumstances, the court must consider: the gravity of the underlying offense; whether delay poses a threat to police or the public safety; the likelihood that the suspect will escape if not quickly apprehended; and whether there is a great likelihood that evidence will be destroyed if the arrest is delayed until a warrant can be obtained.

*Id.* at 176. "A number of courts, including our own, have held that such exigent circumstances exist when government agents reasonably believe that evidence will be destroyed or a suspect will flee if an immediate entry is not made." *Moore*, 790 F.2d at 15.

In narcotics cases in particular, the Court of Appeals for the First Circuit and other courts have consistently found exigent circumstances to exist where there is specific evidence that a supplier of drugs has either detected police surveillance, or is acting nervously, or is expecting his confederate to return at a particular time and would therefore likely flee or dispose of the evidence if his arrested confederate did not return promptly. *See Moore*, 790 F.2d at 15–16 (arrested dealer stated supplier was apprehensive and was expecting him to return promptly with money); *United States v. Edwards*, 602 F.2d 458, 468 (1st Cir.1979) (suspected trafficker pointed towards surveillance team before entering house); *United States v. Padilla*, 869 F.2d 372, 379–80 (8th Cir.1989), (conspirators had "organized the transaction with a near-par-

anoid attention to detail," suggesting that failure of arrested coconspirators to contact defendant would tip him off to arrest; defendant described as armed and violent by arrested coconspirators); *United States v. Socey*, 846 F.2d 1439, 1447 (D.C.Cir.1988) (commotion on street caused by arrest may have alerted coconspirators in house; scale of drug operation made lookouts likely); *United States v. Mabry*, 809 F.2d 671, 674–75, 679 (10th Cir.1987) (arrested dealer stated source expected him to return "right away" with remainder of money); *United States v. Wulferdinger*, 782 F.2d 1473 (9th Cir.1986) (arrested dealer told officers source expected him to return within the hour with money); *United States v. Kunkler*, 679 F.2d 187, 192 (9th Cir.1982) (supplier observed looking nervously down street when dealer did not return); *United States v. Levesque*, 625 F.Supp. 428, 454 (D.N.H. 1985) (trafficker alerted to officers' presence).

Some of these courts have also expressly relied on the general expectations that police have developed through their experience with drug traffickers, including the expectation that a dealer will return promptly to his source with the money, that a supplier may have a dealer followed, and that an arrested coconspirator or third-party observer may report the arrest to the trafficker. *See Padilla*, 869 F.2d at 379 ("the timing of undercover drug transactions makes the simultaneous arrest of all conspirators a matter of special urgency"); *Mabry*, 809 F.2d at 679 ("experience had taught that if the sellers did not return to the residence of the source within a short period of time, the supplier would ... destroy the cocaine"); *Wulferdinger*, 782 F.2d at 1476 ("common practice for drug dealers to place the courier under surveillance;" onlookers to public arrest may report to suppliers).

However, this court has found few cases in which a court relied solely on generalized expectations of drug trafficker behavior in making a finding of exigent circumstances. In *United States v. Kulcsar*, 586 F.2d 1283, 1287 (8th Cir.1978), the court found the existence of a dealer-supplier

relationship sufficient to establish exigent circumstances to enter the supplier's home following the arrest of the dealer:

> Kulcsar was known to be dealing in cocaine from his home, and the agents reasonably believed that narcotics would be on the premises. Had they waited the several hours the record indicates it would have taken to obtain a warrant, Ploof's failure to return with the proceeds of the second sale could be expected to warn Kulcsar that the sale had gone wrong.

586 F.2d at 1287. In *United States v. Flickinger*, 573 F.2d 1349, 1356 (9th Cir. 1978), the court, calling it a "close question," determined that exigent circumstances existed to enter defendants' home following the arrest of codefendants, based primarily on a generalized fear that defendants could be alerted to the arrest:

> It would not be unreasonable for the DEA officers to fear that a warning telephone call would come to the Flickinger home from [arrested codefendants] or from someone they would contact. In addition, the agents could reasonably believe that some or all of the large quantity of marijuana was to be delivered to additional unknown confederates. Not knowing when the marijuana was due at its destination, the agents could reasonably conclude that a concerned prospective recipient might alert Flickinger that the delivery was overdue and thus had possibly been intercepted. Moreover, such an alerting telephone call would, of course, activate the standard exigencies discussed above: escape, destruction of evidence, and danger of violence.

573 F.2d at 1356.

The Court of Appeals for the First Circuit has not provided clear guidance on this issue. In *White*, the court ruled without discussion that where one drug trafficker had been arrested and there was probable cause to believe that a premises occupied by a coconspirator still contained cocaine, a warrantless entry was justified to prevent the destruction of evidence. 766 F.2d at 25–26. In *Palumbo*, on the other hand, the court suggested, without deciding, that generalized apprehensions about the probable behavior of drug traffickers would not always be sufficient to establish exigent circumstances, stating:

> The reason DEA agent Graffam gave at the suppression hearing for "securing" the Palumbo home prior to obtaining a warrant was that, prior to the transaction, a check of the DEA computer indicated that Donna Palumbo had been rumored to be in the drug trafficking business with her husband. Graffam felt that Palumbo would have been expected home by his wife shortly after the drug sale and, if he did not show up within a reasonable time, she would assume something had happened to him and destroy any drugs in the house. She might also learn of trouble directly, there being numerous witnesses at the Ramada Inn watching the arrest, and Palumbo being fairly well known in the area.
>
> The police had no affirmative evidence to back up these apprehensions, and we consider it a rather thin case of exigent circumstances, which should be anything but automatic.

742 F.2d 658. The court did not decide the issue of exigent circumstances, however, because it held that the scope of the warrantless intrusion was unlawful, but that items discovered pursuant to a subsequently issued warrant did not have to be excluded.

The instant case falls somewhere between the facts of the cases cited above in general, and between the fact patterns of *White, Moore* and *Palumbo* in particular. No dealer-supplier relationship apparently existed between Hijos and Hidalgo in this case and there is no direct evidence that Hidalgo expected Hijos to return shortly with the money. In fact, when the agents broke into the apartment, they were not even sure Hidalgo was still there. Nor is there any evidence that Hijos was expected to make another delivery at another time, which would make his absence noticeable. The sale and arrest in this case took place in Dorchester, a significant distance from the Malden apartment, rather than right outside the residence. There is no evidence

that any of Hijos' confederates were in the area or witnessed the arrest.

On the other hand, unlike *Palumbo*, there was specific evidence in this case that more cocaine was present in the apartment. In addition, there was stronger evidence here than in *Palumbo* that Hidalgo was an active conspirator in the drug transaction. Not only had the CI observed Hidalgo participate in the car switch, but he heard Hijos tell Hidalgo to put the remaining cocaine away. Finally, the Task Force agents knew that Hijos had a car phone. It would have been reasonable to infer that he might call Hidalgo to tell him what time the actual sale to the CI would take place.

 Although it is a close question, the court doubts that the government has proven facts sufficient to establish exigent circumstances necessary to support the warrantless entry into Hijos' residence. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). The Supreme Court has time and again emphasized the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." *Payton*, 445 U.S. at 601, 100 S.Ct. at 1388. The special solicitude shown for the individual residence is reflected by the limited set of truly exigent circumstances which will permit an exception to the warrant requirement. Thus, it appears that proof of these circumstances should be supported by particularized, case-specific facts, not simply generalized suppositions about the behavior of a particular class of criminal suspects.

As a practical matter, a finding of exigent circumstance in this case could encourage warrantless entries of residences in numerous future narcotics cases. The many drug cases presented to this court indicate that the narcotics trade often involves cellular telephones and beepers, supplier inventories of narcotics in quantities ranging from several grams to several kilograms, and extensive networks of confederates and coconspirators. Often law enforcement agents only manage to arrest some of the coconspirators with some of their inventory of drugs. There is, therefore, frequently the danger that the remaining traffickers will flee with or destroy the remaining contraband. However, in the absence of particularized evidence of a risk of flight, danger or destruction, this court doubts that law enforcement officers can rely on this generalized threat to excuse compliance with the warrant requirement of the Fourth Amendment.

In this case, however, the court need not, and does not, decide this issue. As explained further below, even if exigent circumstances existed to support a warrantless intrusion into Hijos' apartment, those circumstances were insufficient to justify the Task Force agents' method of entry. Because an unreasonable method of entry requires suppression fully as much as an unjustified warrantless entry, the court does not have to decide, and rely upon, the issue whether exigent circumstances can ever be found solely on generalized experience and assumptions about the behavior of suspected drug traffickers.

### B. The Warrantless Entry Violated the "Knock-and-Announce" Statute

Defendants contend that even if the warrantless entry was justified by probable cause and exigent circumstances, it was invalidated by the agents' failure to comply with the federal "knock-and-announce" statute, 18 U.S.C. § 3109. This contention is correct. Thus, the court holds that on the undisputed evidence of the case, the agents' manner of entry was unlawful.

Section 3109 provides:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

Although the statute speaks only to situations involving a warrant, the Supreme

Court has held that it applies to warrantless searches as well. *Miller v. United States*, 357 U.S. 301, 306, 78 S.Ct. 1190, 1194, 2 L.Ed.2d 1332 (1958). In addition, the Court has held that any unannounced intrusion into a dwelling, including passage through a closed, but unlocked, door, violates the statute. *Sabbath v. United States*, 391 U.S. 585, 590, 88 S.Ct. 1755, 1758, 20 L.Ed.2d 828 (1968). Noncompliance with the rule is excused where exigent circumstances, such as a reasonable belief in the risk of flight or destruction of evidence, militate against its application. *See Ker v. California*, 374 U.S. 23, 40–41, 83 S.Ct. 1623, 1633–34, 10 L.Ed.2d 726 (1963) (plurality opinion) (construing state law counterpart to § 3109).

As with the cases analyzing exigent circumstances to enter discussed above, courts have generally excused compliance with § 3109 when specific evidence existed that a suspect was aware of the presence of police and was engaged in flight or the destruction of evidence. The Court of Appeals for the Second Circuit has expressed this rule as follows:

> [T]his Court has recognized that noncompliance with § 3109's knock-and-announce requirement may be excused ... "(3) where those within, made aware of the presence of someone outside (because, for example, there has been a knock at the door), are then engaged in activity which justifies the officers in the belief that an escape or the destruction of evidence is being attempted."

*United States v. Spinelli*, 848 F.2d 26, 28 (2nd Cir.1988) (quoting *Ker v. California*, 374 U.S. at 47, 83 S.Ct. at 1636 (Brennan, J., dissenting)). This has proven particularly true in drug cases, where the courts have recognized the ease with which the contraband can be disposed. *See Edwards*, 602 F.2d at 461 (agents reasonably believed surveillance had been spotted and heard running water as they approached door); *Spinelli*, 848 F.2d at 29–30 (surveillance spotted and suspect had history of firearm possession and violence); *United States v. Dohm*, 597 F.2d 535, 538 (5th Cir.1979) (after surveillance had been spotted, immediate entry needed to prevent disposal of cocaine).

It is more difficult to find opinions holding that noncompliance with § 3109 is proper where the law enforcement officers know nothing more than that narcotics are present on the premises to be entered. In *United States v. Barrientos*, 758 F.2d 1152, 1159 (7th Cir.1985), the court upheld an unannounced nighttime entry into a motel room with a passkey where there was no light or noise emanating from the room. Although the court noted that "the occupants of the room had possession of cocaine in substantial quantities which could have been destroyed or disposed of quickly had the police given warning of their presence and their purpose," it first acknowledged that the police had been warned that the room's inhabitants were armed and dangerous. *Id.* In this case, by contrast, the Task Force agents had no such information about defendant Hidalgo.

In *United States v. Tolliver*, 665 F.2d 1005, 1008 (11th Cir.1982), the court upheld an unannounced entry where the inhabitants of the apartment opened the door slightly in response to a knock and the police forced the door open the rest of the way. That decision rested more squarely on the single factor that "announcement of identity and purpose would have jeopardized the availability of evidence (the cocaine) which the agents knew to be inside." *Id.*

To the contrary is *United States v. Singer*, 727 F.Supp. 1281 (E.D.Wis.1990), which construed a state law counterpart to § 3109. In that case, the court held invalid an unannounced forceful entry in the absence of particularized evidence that the drugs in question were in the process of being destroyed or that preparations had been made for quick disposal in the event of a police raid. *Id.* at 1284–85. The court quoted at length from a Wisconsin Supreme Court opinion on the subject:

> We reject a blanket approach in narcotics cases that the nature of the evidence itself—without more—allows unannounced entry. The mere fact that drugs fall into a general category of

materials that are by their nature capable of destruction does not justify unannounced entry to execute a search warrant. We conclude that law enforcement officers are justified in dispensing with the rule of announcement only if they have particular grounds in the given case to give them reasonable cause to believe that the drugs will be destroyed. The essence of Fourth Amendment protection against unreasonable searches and seizures is that there must be a specific showing to justify state intrusion into a private dwelling....

[W]ithout further particular information such as, e.g., the quantity of drugs expected to be discovered and that this amount is readily destroyed if announcement is made, or the preparations that have been made to facilitate the destruction of the drugs, or the defendant's destruction of drugs during a previous attempt to search the premises, an allegation that drugs have been sold on the premises is an inadequate reason to believe that the evidence will be destroyed if the police announce their presence prior to the search.

*State v. Cleveland,* 118 Wis.2d 615, 628–30, 348 N.W.2d 512 (1984) (quoted in *Singer,* 727 F.Supp. at 1284).

The Court of Appeals for the First Circuit has never addressed the question whether knowledge of the presence of drugs and the occupancy of the premises by a suspected coconspirator is sufficient by itself to excuse compliance with § 3109.[1] However, in *United States v. DeLutis,* 722 F.2d 902, 909 (1st Cir.1983), a drug trafficking case, the court upheld a forcible entry of defendants' house where the officers waited only 20 seconds between knocking and announcing their purpose and breaking open the door. The government argued "that 20 seconds was sufficient time to wait for a response under the existing circumstances where the cocaine could have been quickly disposed of in the kitchen sink or stove." *Id.* at 908. Without making

any reference to the particular exigencies of drug investigations, the court concluded, "Generally, a wait of 20 seconds is deemed adequate before the officers may force entry." *Id.* at 909.

Similarly, in *United States v. One Parcel of Real Property,* 873 F.2d 7, 9 (1st Cir. 1989), the court upheld a search and seizure against a § 3109 challenge where the agents knocked at the rear door, did not identify or announce themselves, and broke in five to ten seconds later. The court excused compliance with the statute because another team had already been knocking on the front door and shouting "Police" for several moments without response and because the officers had a reasonable fear that the cocaine inside would be destroyed. *Id.* Thus, the court stated:

> The fact that the officers had probable cause to believe that the occupants possessed cocaine, a substance that is easily and quickly removed down a toilet is additional justification for the shorter wait before entry.

*Id.* Perhaps significantly, the court cited *Tolliver,* 665 F.2d at 1008, a case where no specific exigent circumstances were apparently present, in support of the above statement. *Id.*

In *Miller,* the Supreme Court stated:

> The requirement of prior notice of authority and purpose before forcing entry into a home is deeply rooted in our heritage and should not be given a grudging application. Congress, codifying a tradition embedded in Anglo–American law, had declared in § 3109 the reverence of the law for the individual's right of privacy in his house.

357 U.S. at 313, 78 S.Ct. at 1198. In light of the fundamental values embodied in § 3109 and the minimal burden involved in complying with *DeLutis* by knocking, announcing "Police," and waiting twenty seconds, the court holds that the officers' failure to comply with § 3109 in this case was not justified by exigent circumstances.

The court did not discuss whether the officers knocked, identified themselves and announced their purpose prior to entering.

---

1. In *Moore,* 790 F.2d at 15, the First Circuit merely noted that the law enforcement officers entered the apartment without a warrant and discovered defendant sitting in her bedroom.

■ In this case, there is no evidence that the officers believed Hidalgo had spotted them or that Hidalgo was dangerous. In fact, while they believed that Hidalgo might be in the apartment, they were not certain of this until they broke the door down. The CI had not reported any special fortification of the apartment which might make entry difficult or any special preparations for the destruction of narcotics. To the contrary, the CI's observations most reasonably supported the inference that the drugs were back in the hall closet, easily but not immediately accessible to any occupant of the apartment. In addition, the CI had seen three one-kilogram bags of cocaine, not an amount which could have been disposed of in a matter of seconds. Further, the agents knew that at least the kilogram seized earlier in the day was in solid, rather than powder, form and therefore would take longer to destroy. As Velazco testified, Hidalgo could not have destroyed this much cocaine in ten to fifteen seconds, but could have only disposed of it by throwing it out a window, where the Task Force had agents stationed.

■ In fact, Velazco testified that if he had to conduct the raid again today, he would comply with the knock and announce requirements of § 3109. As he acknowledged at the Suppression Hearing, his primary reason for not knocking on December 8, 1989 was the additional risk that a potentially armed suspect presented to a group, such as the Task Force, which did not have much experience in working together. Velazco's candor and his concern for his men are both highly commendable. However, a criminal suspect's statutory and constitutional rights cannot vary with the skill of the officers pursuing him, nor can exigent circumstances be created from a law enforcement unit's inexperience as a team.

In light of the complete absence of any case-specific evidence that Hidalgo was dangerous or might have destroyed the cocaine if the requirements of § 3109 had been observed, the court holds that the agents' manner of entry into Hijos' apartment violated § 3109 and was unreasonable under the Fourth Amendment. In this case, the officers could have knocked, identified themselves and waited twenty seconds before, if necessary, breaking down the door, without running an unreasonable risk of losing the suspect or the desired evidence, or of subjecting themselves to a special risk of physical harm. Any indications of flight or destruction of evidence, such as running feet or running water, would have warranted a more rapid entry. Following such a procedure in this case would have served the primary purpose of § 3109, preserving the sanctity of the home, as well as the statute's additional goals of minimizing the potential for violence directed against police officers who are not identified as such and preventing the unnecessary destruction of private property. *See Singer,* 727 F.Supp. at 1283.

C. *The Illegal Method of Entry Requires Exclusion of Hidalgo's Post-Arrest Statements*

■ The Task Force's failure to comply with § 3109 requires exclusion of all evidence obtained, including Hidalgo's post-arrest statements, as a result of the illegal entry. *See Miller,* 357 U.S. at 314, 78 S.Ct. at 1198; *Singer,* 727 F.Supp. at 1285. This conclusion is compelled for two related reasons.

■ First, the Supreme Court held in *Miller,* 357 U.S. at 314, 78 S.Ct. at 1198, that evidence seized as the result of an entry in violation of § 3109 should be suppressed. In this case, the court finds that there was a direct relationship between Hidalgo's admissions and the officer's illegal manner of entry. Hidalgo testified that he was awakened by a noise like an explosion, made by the battering ram as it broke open the door. As he entered the living room he was thrown to the ground by a dozen or so men with drawn guns. Although the men shouted "Police," they were dressed in street clothes and did not look particularly like law enforcement officers. Hidalgo testified that the unheralded and forceful nature of the entry contributed to his confusion, intimidation and fright, and that this was still his state of mind when he offered to cooperate fifteen minutes after the ini-

tial entry. The court believes Hidalgo's testimony in this regard and thus concludes that his statements must be suppressed as a direct result of the officers' unlawful actions.

 Second, the court holds that Hidalgo's admissions should be suppressed under the longstanding rule of *Payton*, 445 U.S. at 573, 100 S.Ct. at 639, and its progeny that routine felony arrests may not be made within a household without a warrant absent exigent circumstances. Absent a special exception, warrantless entries and arrests in violation of this rule will lead to the suppression of any evidence obtained and custodial statements taken inside the residence. *See New York v. Harris*, ―― U.S. ――, 110 S.Ct. 1640, 1645, 109 L.Ed.2d 13 (1990) ("a warrantless entry will lead to the suppression of any evidence found or statements taken inside the home"); *Minnesota v. Olson*, ―― U.S. ――, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Although these cases address situations in which exigent circumstances to enter did not exist, rather than violations of § 3109, the court believes that their rationale is equally applicable to this case, given the fundamental values embodied by § 3109 and the statute's special solicitude for the sanctity of the home.[2]

D. *The Physical Evidence Is Admissible under the Independent Source or Inevitable Discovery Exceptions to the Exclusionary Rule*

 As stated earlier, the physical evidence discovered pursuant to an illegally-executed warrantless entry is subject to being suppressed. *Miller*, 357 U.S. at 314, 78 S.Ct. at 1198. However, the Supreme Court and the Court of Appeals for the First Circuit have clearly stated that such evidence should not be suppressed when it is either subsequently or independently dis-covered through execution of an untainted warrant. *See Segura v. United States*, 468 U.S. 796, 813–816, 104 S.Ct. 3380, 3391, 82 L.Ed.2d 599 (1984); *United States v. Silvestri*, 787 F.2d 736, 746 (1st Cir.1986); *United States v. Curry*, 751 F.2d 442, 448–49 (1st Cir.1984). As discussed more fully below, the court holds that the search warrant obtained by Agent Fencer in this case was valid and was completely untainted by the illegal entry. While it is not sufficient to preserve the admissibility of Hidalgo's post-arrest statements, which would not have been made but for the improper forceful entry, the warrant does protect the physical evidence from suppression.

In *Segura*, 468 U.S. at 813–16, 104 S.Ct. at 3389–91, the Supreme Court held that evidence discovered pursuant to a lawful warrant obtained solely through information available to the law enforcement officers prior to an unlawful entry need not be suppressed because of that unlawful entry. The Court of Appeals for the First Circuit applied this independent source rule in *Curry*, 751 F.2d at 448–49, to admit evidence discovered in a warrant search occurring eight hours after an illegal entry where probable cause to search existed before the illegal entry and "others in good faith" were "in the process of obtaining a warrant" while the illegal entrants were preserving the status quo.

Neither *Segura* nor *Curry* addressed the disposition of evidence seized during an illegal entry and search prior to the issuance of a valid warrant. This issue was resolved in *Silvestri*, 787 F.2d at 746, in which the Court of Appeals concluded that where a valid search warrant was sought and obtained based on facts known before the illegal search, the inevitable discovery rule, as opposed to the independent source exception, would allow admission of the previously seized evidence. In that case,

---

**2.** Defendants also contend that Hidalgo's arrest was not supported by probable cause. However, the court finds that the CI's observations of Hidalgo at the apartment, as conveyed to the Task Force agents, and his description of Hidalgo, as a heavyset, mustachioed Hispanic male, was sufficient in conjunction with Hidalgo's presence in the apartment "to warrant a pru-dent [person] in believing that the [defendant] had committed or was committing an offense," namely conspiracy to possess and distribute cocaine. *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir.1987) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)).

the court admitted a large quantity of drugs discovered through illegal entry into a garage, even though the warrant application process had not been initiated prior to the entry. The court explained:

> Given the facts available to Sergeant Carpenito, who ordered the pre-warrant securing of the defendant's premises and later drafted the affidavits for the warrants, we are confident that a search warrant for the garage would have inevitably been sought and issued even if the illegal search had never taken place. The district court properly admitted the drugs found in the garage as evidence.

787 F.2d at 746.

In this case, the decision to seek a search warrant was clearly made prior to the illegal entry into Hijos' apartment, and Fencer, who did not participate in securing the apartment, had begun the warrant application process either before or simultaneous with the illegal entry. Fencer's affidavit in support of the warrant application contained only information known to him before the entry occurred. No evidence was presented at the Suppression Hearing that the application process was influenced or infected in any way by information obtained following the entry.

Further, the court finds that the warrant obtained was valid in all respects. The Court of Appeals for the First Circuit set forth the standard for assessing the validity of warrants in *White:*

> In determining whether probable cause is established in the affidavit, the magistrate (and the reviewing court) is required to make a practical, common-sense decision whether, given all the circumstances, there is a fair probability that contraband or evidence will be found in the place described.... A finding of probable cause can be supported by less evidence than is required to support a conviction, ... and not all plausible lawful explanations of the situation must be negated.

766 F.2d at 25 (cites omitted). "Perhaps the central teaching of [the] decisions bearing on the probable-cause standard is that it is a 'practical nontechnical conception.'"

*Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). In rejecting the traditional "two-pronged test" of veracity/reliability and basis of knowledge in assessing probable cause based on an informant's tip, the Supreme Court stressed that probable cause is to be determined from the "totality of circumstances" known to the investigating officer at the time of the search or arrest. *Id.* 462 U.S. at 230, 103 S.Ct. at 2328.

In the instant case, Fencer's affidavit amply established probable cause for issuance of the warrant. Agent Fencer averred that he had 19 years experience with the DEA. Fencer Aff. at ¶ 1. He stated that the CI in this case had provided reliable and trustworthy information on drug trafficking to the DEA and FBI in the past. *Id.* at ¶ 2; *see United States v. Bruner,* 657 F.2d 1278 (D.C.Cir.1981) (warrant upheld where affidavit described two informants as "proven to be reliable in narcotics cases in the past" and reliable in providing "accurate information on numerous occasions"). Fencer then detailed the events of November 13 and December 8, buttressing the CI's reliability by demonstrating his ability to set up the promised transactions. Fencer Aff. at ¶¶ 3–11. In particular, Fencer relayed the CI's observations that three other packages, apparently containing cocaine, had been left by Hijos in the 16 James Street apartment. *Id.* at ¶ 8. Fencer described the arrests at Church's Fried Chicken and the positive field test on the cocaine provided by Hijos. *Id.* at ¶ 11. He also stated that based on his training and experience, money and records are often kept where cocaine is stored. *Id.* at ¶ 12. Based on this information, he requested and the magistrate approved a warrant to search Apartment 14 at 16 James Street for:

i) .... a quantity of cocaine;

ii) books, records, ledgers or other documents which evidence a pattern of sale, distribution or acquisition of cocaine;

iii) money or negotiable instruments;

iv) documents which indicate dominion or control over the premises.

*Id.* at ¶ 13.

■ As discussed in subsection A above, the facts recited by Fencer in his affidavit, including the reported observations of the CI, the corroborative observations of the supervising DEA agents and Fencer's extensive experience in the field of narcotics investigation provided ample probable cause to search the apartment for the listed items. With regard to the money and records described in items (ii) and (iii) in particular, Fencer's sworn statement that, in his experience, these are often found where cocaine is stored is sufficient to establish "a fair probability" that such evidence would be found in the place described. *White*, 766 F.2d at 25; *United States v. Peagler*, 847 F.2d 756 (11th Cir. 1988). Further, the request for a warrant for these items must be read in the context of the affidavit as a whole. *Andresen v. Maryland*, 427 U.S. 463, 480–81, 96 S.Ct. 2737, 2748–49, 49 L.Ed.2d 627 (1976). Here it is clear that all items requested related to the crime of cocaine distribution, probable cause of which was established by the facts in the affidavit. *Id.; United States v. Jones*, 801 F.2d 304 (8th Cir.1986) (warrant authorizing search for "drug paraphernalia" not overly broad).

■ In addition, the warrant's authorization to search for and seize documents demonstrating dominion and control over the apartment was also valid under the circumstances of this case. The Court of Appeals for the Ninth Circuit approved such a warrant in *United States v. Whitten*, 706 F.2d 1000, 1009 (9th Cir.1983), stating, "Where multiple defendants were suspected to have utilized the premises as a laboratory and headquarters for a large-scale illegal drug operation, it was reasonable to authorize the arresting agents to search for evidence showing who occupied and controlled the premises." Similarly, in *United States v. Reed*, 726 F.2d 339, 342 (7th Cir.1984), the Court of Appeals for the Seventh Circuit held that "a warrant search for proof of residency in conjunction with a search for other named contraband

is sufficiently narrow for constitutional purposes."

■ The warrant in this case was also sufficiently particular in its description of the items to be seized to pass constitutional muster. Read as a whole, it did not leave discretion to the executing agents as to the items to be seized, *see Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965), or authorize "general exploratory rummaging in a person's belongings," *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). The warrant authorized only seizure of a quantity of cocaine, books, ledgers and other records relating to cocaine distribution, and money or negotiable instruments. There is little danger that there would be a substantial body of similar contraband unrelated to the underlying crime at the apartment or that, given the warrant description, the executing agents would have trouble distinguishing the seizable contraband from the rest of the defendants' possessions. *See United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir.1987).

Because the court holds that the subsequently approved search warrant was valid, the physical evidence seized at the James Street apartment will not be suppressed. In particular, the court finds that the two kilograms of cocaine discovered in the hall closet are admissible under the independent source exception to the exclusionary rule, because they were not seized by the Task Force agents until after issuance of the valid warrant. Moreover, the agents already suspected the cocaine was located in the closet from the report of the CI, who had seen the cocaine removed from the closet earlier in the afternoon. Thus, Hidalgo's suppressed statements concerning the location of the cocaine did not affect the independent basis for the later search or seizure. As discussed below, the cocaine would also be admissible by virtue of the inevitable discovery rule.

■ The court further holds that the other seized items, such as the money and the scales, are admissible under either the independent source rule of *Segura* and

*Curry* or the inevitable discovery exception of *Silvestri*. As discussed above, the warrant, which was being sought even as the agents secured defendants' apartment, provided a truly independent basis on which the apartment would have been inevitably searched and the items inevitably seized.[3]

▉ With regard to the inevitable discovery rule, the court finds that each of its purposes and elements is satisfied in this case. The inevitable discovery rule generally permits admission of tainted evidence when it would certainly have been revealed in the absence of official misconduct and the deterrent effect of the exclusionary rule is so attenuated as to be practically inoperable under the facts of a given case. *Nix v. Williams*, 467 U.S. 431, 444–45, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). The Court of Appeals for the First Circuit amplified the contours of the inevitable discovery doctrine in *Silvestri*, stating:

> [T]here are three basic concerns which surface in an inevitable discovery analysis: are the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken Fourth Amendment protection?

787 F.2d at 744. As described earlier, it is evident that the warrant which constituted the legal means of search was truly independent of the improper conduct and the discovery of the items at issue was truly inevitable.

▉ The court has, however, carefully considered whether the application of the inevitable discovery exception in this case would significantly weaken Fourth Amendment protection or provide an incentive for police misconduct. The court concludes that it would not.

As described in detail earlier, it is a close question whether there were exigent circumstances sufficient to justify the warrantless entry and the failure to knock and announce the officers' purpose. Assuming that both were unjustified in this case, the law in this area is not clearly established. In addition, at least with regard to the failure to knock and announce, the leader of the Task Force was motivated in part by solicitude for his colleagues' safety rather than by a callous insensitivity to a target's Fourth Amendment rights. Thus, the court concludes that it would not significantly injure Fourth Amendment protection to apply the inevitable discovery exception with regard to the conduct in this case.

If the court believed, however, that the agents had systematically searched for and seized the cocaine before the warrant was issued, then lied about this in their testimony, the Fourth Amendment's protection would be materially eroded, and police misconduct in the form of false testimony would be abetted by application of the inev-

---

**3.** Defendants contend that the seizure of the scales and gun, which were not listed in the warrant, was unconstitutional. The court concludes this contention is without merit.

Recently, in *Horton v. California*, —— U.S. ——, 110 S.Ct. 2301, 110 L.Ed.2d 112 (June 4, 1990), the Supreme Court reaffirmed the plain view doctrine, and expressly eliminated the requirement that seizures pursuant to this doctrine must be inadvertent. The Court stated:

> In this case, the scope of the search was not enlarged in the slightest by the omission of any reference to the weapons in the warrant. Indeed, if the three rings and other items named in the warrant had been found at the outset—or if petitioner had them in his possession and had responded to the warrant by producing them immediately—no search for weapons could have taken place....
>
> In this case the items seized from petitioner's home were discovered during a lawful

search authorized by a valid warrant. When they were discovered, it was immediately apparent to the officer that they constituted incriminating evidence. He had probable cause, not only to obtain a warrant to search for the stolen property, but also to believe that the weapons and handguns had been used in the crime he was investigating. The search was authorized by the warrant, the seizure was authorized by the "plain view" doctrine.

*Id.* 110 S.Ct. at 2310–11. In this case too, the agents had probable cause to believe that the scales and gun, normal accoutrements of narcotics crimes, were incriminating instrumentalities of the alleged cocaine conspiracy. Because the seizure of these items did not expand the scope or duration of the search beyond that authorized in the warrant, no constitutional violation occurred.

itable discovery rule here. Indeed, such a combination of a Fourth Amendment violation and improper testimony has caused this court to decline to apply the inevitable discovery rule in another case involving the Boston Task Force being decided today. *See United States v. Rullo*, 748 F.Supp. 36 (D.Mass.1990).

In the instant case, however, the court credits Velazco's testimony that he told the agents not to search for or seize the cocaine prior to the issuance of the warrant and that they generally complied with his directions. The court does find, however, that in several respects the officers behaved in an imperfect or unprofessional manner. Examples of this include the drinking of beer, the movement and tinkering with the telephone, the use of the videotapes and, most significantly, the agents' failure to find out what items they were authorized to seize once the warrant was issued.[4] Fundamentally, however, Velazco did not permit a search for, or seizure of, the drugs before the warrant was issued.

Similarly, while the testimony of several of the officers was inconsistent, the court regards such inconsistencies to be the result of unimpressive confusion rather than as part of a deliberate effort to mislead as discerned in *Rullo*. *Id.* Therefore, application of the inevitable discovery rule in this case should not abet misconduct in the form of improper testimony in future cases.

## III. CONCLUSION

For the reasons stated above, it is hereby ORDERED that the defendants' motions to suppress are granted with regard to Jose Hidalgo's post-arrest statements made inside Apartment 14 at 16 James Street in Malden, Massachusetts on December 8, 1989 and are otherwise denied.

---

4. Velazco testified that he and his officers did not know or care about what items were listed in the warrant prior to executing the warrant search. Such attitudes and behavior threaten the Fourth Amendment's warrant requirement and the related system of independent review and authorization by the courts. The failure to ascertain the details of the warrant, however, does not affect either the validity of the warrant or the remainder of the court's analysis in this case. Had the agents' search extended beyond the scope approved in the warrant, any illegally seized evidence would have been excluded and the independent source and inevitable discovery rules would not have applied. Because the court finds that any search conducted by the agents in this case fell within the limits authorized by the warrant, suppression is not required or appropriate. Law enforcement officers would be well-advised, however, to pay closer attention to individual warrant restrictions in the future, both to preserve the constitutional rights of the subjects of investigation and to ensure that prosecutions are not injured by the suppression of evidence.