UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-40271

_____

TOINETTE FONTENOT & WILLIAM BRANDENBURG,

Plaintiffs-Appellants,

versus

DALLAS CORMIER, ET AL.,

Defendants,

BOB FINLEY, DONALD BROWN, SCOTT BUSSEY
& JOE GUIDRY,

Defendants-Appellees

_____

Appeals from the United States District Court
for the Western District of Louisiana

_____

(June 20, 1995)

Before DAVIS and WIENER, Circuit Judges, and VANCE,[*] District
Judge.

VANCE, District Judge:

Toinette Fontenot and William Brandenburg appeal from an order
by a United States Magistrate Judge in the Western District of
Louisiana granting judgment as a matter of law to the defendants on
the grounds of qualified immunity and conditionally granting the

_____

[*]    District Judge of the Eastern District of Louisiana, sitting
by designation.

defendants' motion for a new trial. We affirm the magistrate judge's order as to William Brandenburg, but we reverse and remand for further proceedings consistent with this opinion as to Toinette Fontenot.

## I.    BACKGROUND

Shortly after 2:00 a.m. on January 21, 1991, the Jefferson Davis Parish Sheriff's Office received an emergency telephone call from a local convenience store "about a man with a gun." The Sheriff's Office dispatched shift supervisor Deputy Robert Trahan to investigate. A patron subsequently informed Trahan that he had been assaulted by William Brandenburg. Several other patrons also identified Brandenburg by name as the alleged assailant.

Brandenburg was well known among Jefferson Davis Parish Sheriff Deputies as a convicted felon with a history of violence. The deputies also knew that during his incarceration, Brandenburg had been a "trustee" [sic] of the parish prison and that he had recently testified before a grand jury in connection with a corruption investigation concerning the Jefferson Davis Parish Sheriff's Office.[1] After a search of the convenience store and surrounding area failed to uncover Brandenburg, Trahan ordered Sheriff Deputies Bob Finley, Donald Brown, Scott Bussey, and Joe Guidry to pick Brandenburg up for questioning. Trahan directed the

---

[1]    "Trustees" [sic] were prison inmates who allegedly did work for the Sheriff and his deputies in exchange for various privileges, including being granted extended liberties from incarceration.

deputies to Toinette Fontenot's residence, where Brandenburg was known to reside. Trahan stayed behind at the convenience store to gather additional information.

The deputies traveled the short distance to Fontenot's residence in three squad cars, arriving at approximately 2:30 a.m. To illuminate the area, the deputies trained their vehicle lights across Fontenot's home and then approached the residence on foot from two directions. Deputies Finley, Brown, and Bussey entered Fontenot's carport at the side of the house. While Deputies Brown and Finley walked up to the carport door entrance, Deputy Bussey positioned himself at a back wall with a shotgun pointed at the door. Deputy Brown held his handgun in a ready position. Meanwhile, Deputy Guidry approached the house from the back, positioning himself at a back door entrance. His gun was also drawn. Before the deputies took any further action, Fontenot, who had been awakened by the vehicle lights, appeared at the carport door entrance. Fontenot immediately saw Deputy Brown facing her through a window in the door. His gun was pointed directly at her. One of the deputies commanded: "Jeff Davis Sheriff's Office--open up!" Fontenot complied, and the three deputies located in the carport moved quickly into her home. Deputy Guidry followed.

Upon entering the residence, the deputies searched the rooms adjoining the carport door entrance. Frightened for the safety of her sleeping daughter, Fontenot ordered the deputies not to venture further into the home. The deputies complied. Fontenot then asked the deputies why they were at her home and what they wanted. The

3

deputies told her that they were "not at liberty" to disclose such information and proceeded to ask her a series of questions concerning Brandenburg. Fontenot told the deputies that Brandenburg had left the house to get a pack of cigarettes. Fontenot again asked the deputies why they were inside her home. She also asked whether they had a search warrant. The deputies told Fontenot that they did not have a warrant. They also told her that they had been sent to "pick up" Brandenburg but refused to tell her why. During the exchange, Fontenot told the deputies to calm down and to explain what was happening. On several occasions, she also told them they "needed to leave." The deputies ignored Fontenot's demands to leave but holstered their guns.

Within a few minutes, Brandenburg arrived on the scene, parking his car on the road in front of the house. At that point, the deputies left Fontenot's home and rushed toward Brandenburg's car. Guns drawn, the deputies ordered Brandenburg out of the vehicle and informed him that they had been ordered to pick him up for questioning. Brandenburg exited the vehicle with his hands up. He then asked the deputies if they had a warrant. The deputies told Brandenburg that they did not have a warrant. Brandenburg refused to go with the deputies and accused them of being there to retaliate against him for testifying before the grand jury. He then dashed for the cover of the carport. As Brandenburg ran toward the carport, Deputy Guidry tackled him but was shrugged off.

Once safely in the carport, Brandenburg positioned himself at its back end. Fontenot stood behind him. Both Fontenot and

Brandenburg told the deputies to leave, but they remained at the front end of the carport. Their guns were drawn. Within a few moments, Brandenburg and Fontenot were joined in the carport by Brandenburg's pitbull terrier. A standoff ensued.

During the standoff, the deputies attempted to convince Brandenburg to come with them voluntarily. Brandenburg refused to do so unless state troopers were brought to the scene to ensure his protection. While the parties discussed the terms of Brandenburg's surrender, the pitbull terrier lunged at the deputies. Deputy Bussey threatened to shoot the dog if it came any closer. Brandenburg pulled the dog back by its collar. He then broke off the handle of a broom and warned that no one was going to shoot his dog. After approximately thirty minutes of fruitless discussion, the deputies became convinced that Brandenburg would not come with them voluntarily. They radioed Trahan for instructions. Trahan told the deputies to leave, which they did. A warrant charging Brandenburg with aggravated assault was issued the next day, and he was arrested without incident.

## II. PRIOR PROCEEDINGS

In their complaint, Brandenburg and Fontenot allege that Deputies Finley, Bussey, Guidry, and Brown, together with Deputy Trahan and Jefferson Parish Davis Sheriff Dallas Cormier, violated their constitutional rights and committed various intentional torts during the January 21, 1991 stand-off. Plaintiffs further allege that they are entitled to damages under 42 U.S.C. § 1983 and

5

Louisiana state law. The parties consented to a jury trial before a magistrate judge.

During trial, the magistrate judge dismissed plaintiffs' claims against Sheriff Cormier. The jury found in favor of Deputy Trahan on all claims but returned a verdict in favor of both plaintiffs against Deputies Finley, Bussey, Guidry, and Brown on plaintiffs' Section 1983 claims. The jury awarded Toinette Fontenot $15,000 in compensatory damages and $2,500 in punitive damages. William Brandenburg was awarded $10,000 in compensatory damages. The deputies subsequently filed a motion for judgment as a matter of law and alternatively, a motion for a new trial. Finding the deputies entitled to qualified immunity, the magistrate judge granted their motion for judgment as a matter of law and conditionally granted their motion for a new trial.

## III. DISCUSSION

Plaintiffs' first point of contention is that the magistrate judge erred in granting the defendants' motion for judgment as a matter of law. In determining the propriety of the magistrate judge's order, we consider all of the evidence in the light most favorable to the parties opposed to the motion. *Barnett v. Internal Revenue Service*, 988 F.2d 1449, 1453 (5th Cir.), *cert. denied*, ____ U.S. ____, 114 S. Ct. 546 (1993). If the facts and inferences point so strongly and overwhelmingly in favor of the defendants that reasonable jurors could not have arrived at the verdict reached in this case, the magistrate judge's order will be

upheld. *Crist v. Dickson Welding, Inc.*, 957 F.2d 1281, 1285 (5th Cir.), *cert. denied*, ____ U.S. ____, 113 S. Ct. 187 (1992). On the other hand, the magistrate judge was not free to adjudicate the facts *de novo*. We must therefore reverse if the evidence before the jury was such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. *Molex, Inc. v. Nolen*, 759 F.2d 474, 478 (5th Cir. 1985).

In his order, the magistrate judge held that the deputy defendants were entitled to qualified immunity with respect to plaintiffs' claims under 42 U.S.C. § 1983. Under the doctrine of qualified immunity, law enforcement officers may not be held liable for civil damages so "long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Enlow v. Tishomingo County*, 962 F.2d 501, 508 (5th Cir. 1992)(citations omitted); *see Harper v. Harris County*, 21 F.3d 597, 600 (5th Cir. 1994). The examination of a claim of qualified immunity is a two-step inquiry. First, a court must determine whether plaintiff has alleged a violation of a clearly established right. *See Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 1793 (1991). Second, the court must determine whether the officer's conduct was objectively reasonable in light of the legal rules applicable at the time of the alleged violation. *Id.* The inquiry is conducted without regard for the law enforcement officer's actual state of mind or subjective motivations. Instead, the court attempts to put itself "in the shoes of a reasonable police officer as he or she approaches a given situation and assesses the

7

likelihood of danger in a particular context." *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992) (*en banc*).


A.  **Brandenburg's Claims**

Brandenburg alleges that the defendants' conduct during the January 21, 1991 standoff amounted to an unlawful seizure and that the officers used excessive force in attempting to effect his arrest.[2]  Both allegations implicate well-established rights under the Fourth Amendment and are thus sufficient to satisfy the first step of the qualified-immunity analysis.  Our concern therefore is with whether, when viewed objectively, the facts and circumstances surrounding the standoff support as objectively reasonable the deputies' conduct with regard to Brandenburg.  We find that they do.

In order to make a warrantless arrest in a public place, the arresting officers must have probable cause to believe that the suspect has committed, is committing, or is about to commit a crime.  *See Harper v. Harris County*, 21 F.3d 597, 601 (5th Cir. 1994); *United States v. Mason*, 665 F.2d 765, 769 (5th Cir. 1982). In this case, the victim of the alleged assault identified

---

2    There are three tiers of police-citizen encounters: communications between police and citizens involving no coercion or detention; investigatory stops; and full-scale arrests. *United States v. Watson*, 953 F.2d 895, 897 n.1 (5th Cir.), *cert. denied*, 504 U.S. 928, 112 S. Ct. 1989 (1992).  Brandenburg and the deputies dispute the nature of the detention involved here.  However, since we find that the deputies had probable cause warranting the arrest of Brandenburg, the most coercive form of detention, the distinction between the types of detention is not critical to the resolution of this case.

Brandenburg by name. The victim's identifying statement was corroborated by other patrons. The deputies also knew that Brandenburg was a convicted felon and that he lived nearby. Under these circumstances, the deputies had probable cause to believe that Brandenburg had committed a crime. *See United States v. Dougall*, 919 F.2d 932, 934 (5th Cir. 1990), *cert. denied*, 501 U.S. 1234 (1991) (probable cause may rest on victim's description of assailant).

Brandenburg argues that the existence of probable cause did not authorize the deputies to arrest him when he was physically located on Fontenot's property. In support of his argument, Brandenburg relies on the Supreme Court's decision in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371 (1980). *Payton* teaches that the Fourth Amendment prohibits law enforcement officers from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. *Id.* at 576, 100 S.Ct. at 1374-75; *see also United States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993). The decision rests on the heightened interest of privacy associated with being free from intrusion in one's home or dwelling. *Id.* at 587-88, 100 S.Ct. at 1380-81. However, this Court has held that the expectation of privacy recognized in *Payton* does not exist when a felony suspect stands at the open door of his residence or is otherwise accessible to the public. *See United States v. Carrion*, 809 F.2d 1120, 1128 (5th Cir. 1987) (doorway of hotel room); *United States v. Holland*, 755 F.2d 253, 255 (5th Cir.), *cert. denied*, 471 U.S. 1125, 105 S. Ct. 2657 (1985) (common

9

hallway); *United States v. Mason*, 661 F.2d 45 (5th Cir. 1981) (front door of home).

The deputies made initial contact with Brandenburg when Brandenburg sat in his car on a public street in front of his home. The deputies rushed the car with guns drawn and ordered Brandenburg out of the vehicle. They announced their intention to detain him, and Brandenburg exited the vehicle with his hands up. When Brandenburg ascertained that the deputies did not have a warrant, he fled and was temporarily tackled by Deputy Guidry before he reached Fontenot's carport. In *California v. Hodari*, ____ U.S. ____, 111 S. Ct. 1547 (1991), the United States Supreme Court confirmed that a seizure occurs for Fourth Amendment purposes when, by physical force (however slight) or a show of authority, a law enforcement officer restrains the liberty of a citizen in some way. Here, Brandenburg submitted to a show of authority in a public street when he exited his vehicle with his hands up upon police orders. He was thereafter subjected to physical force in a publicly accessible area when Deputy Guidry attempted to subdue him as he fled across Fontenot's yard. Thus, contrary to plaintiff's arguments, the deputies' seizure of Brandenburg did not occur in a private place. Because Brandenburg did not have a protectable privacy interest in the public street or in Fontenot's yard, and the deputies had probable cause to believe that he had committed a crime, their seizure of Brandenburg was lawful.

Brandenburg's subsequent escape to the safety of the carport does not change matters. Brandenburg had no expectation of privacy

10

in the carport either. It was open to public view and accessible from the street. Moreover, even if Brandenburg had had an expectation of privacy when standing under the carport, a felony suspect cannot defeat a lawful arrest begun in a public place by escaping into a private place. *See United States v. Santana*, 427 U.S. 38, 43, 96 S.Ct. 2406, 2409-10 (1976). The deputies were therefore well within the bounds of the Fourth Amendment when they detained Brandenburg while he stood under the carport.

Brandenburg's Fourth Amendment excessive force claim merits little discussion. To prevail on his claim, Brandenburg was required to prove a significant injury, which resulted directly and only from the use of force that was clearly excessive to the need, and that the excessiveness of the need was objectively unreasonable.[3] *See Johnson v. Morel*, 876 F.2d 477 (5th Cir. 1989) (*en banc*). Although the standoff between the deputies and Brandenburg lasted over half an hour, the only force actually used against Brandenburg was Deputy Guidry's effort to tackle him. Brandenburg suffered no significant injury from this attempt to subdue him. Moreover, Guidry's use of nondeadly force was objectively reasonable in light of Brandenburg's history of violence and what could reasonably have been viewed as an effort on Brandenburg's part to escape. *See Graham v. Connor*, 490 U.S. 386,

---

3    Because the events in this case took place in 1991, the objective reasonableness of the defendants' use of force must be evaluated under the significant injury test that prevailed at the time. *See Harper v. Harris County*, 21 F.3d 597 (5th Cir. 1994); *compare Hudson v. McMillian*, __ U.S. __, 112 S.Ct. 995 (1992) (overruling the significant injury prong in an Eighth Amendment excessive force context).

11

396, 109 S.Ct. 1865, 1871-72 (1989).

In sum, we find that the seizure and force used in this case were reasonable under the circumstances. The deputies are therefore entitled to qualified immunity for their actions against Brandenburg. The magistrate judge's order is thus affirmed to the extent that it granted judgment as a matter of law in favor of the deputies and against Brandenburg.

## B.    Fontenot's Claims

Fontenot argues that the deputies violated the Fourth Amendment by entering her home without a warrant. At the time of the incident in this case, it was well-established that a warrantless, nonconsensual entry into a home is presumptively unreasonable. *Payton*, 445 U.S. at 576; 100 S. Ct. 1374-75. *Hartsfield v. Lemachs*, 50 F.3d 950, 954 (11th Cir. 1995); *United States v. Curry*, 751 F.2d 442, 448 (1st Cir. 1984); *cf. Vasquez v. Snow*, 616 F.2d 217 (5th Cir. 1980) (finding a violation of the Fourth Amendment where officer entered third party's home without warrant or probable cause to believe suspect was at that location). Such an entry may, nonetheless, be reasonable when law enforcement officers have probable cause to believe a felony suspect is at the location and exigent circumstances exist. The Court has already determined that the deputies had probable cause to arrest Brandenburg. They also had probable cause to believe that Brandenburg would be at Fontenot's home since that was where he resided. However, there was no evidence to suggest, and defendants

12

do not contend, that exigent circumstances were present at the time they arrived at Fontenot's home. Rather, defendants assert that Fontenot implicitly consented to their entry and search for Brandenburg by opening the door to her home. We disagree.

Fontenot was abruptly awakened in the middle of the night by bright lights shining through her bedroom window. When she went to investigate what was happening, she was confronted by three uniformed officers. A fourth officer was standing at her back door. At least two of the officers had weapons pointed directly at her. The deputies did not knock or ask if they could enter the residence. Instead, one of the deputies identified himself as a law enforcement officer and ordered Fontenot to open the door. Faced with this show of authority, Fontenot could have reasonably concluded that she had no choice but to comply with the order or risk being subjected to physical, possibly deadly, force. *See United States v. Edmondson*, 791 F.2d 1512, 1515 (11th Cir. 1986) (suspect does not consent to entry of residence when consent is prompted by show of official authority). Accordingly, Fontenot's act of opening the door did not amount to consent, and the deputies were not free to enter her residence.

The unreasonableness of the deputies' conduct is further demonstrated by their subsequent refusals to leave the residence after entry. Fontenot testified that on several occasions, she told the deputies that "they needed to leave." These statements were sufficiently explicit to put the deputies on notice that their presence was unwelcome and their conduct unlawful. They,

13

nevertheless, failed to leave the premises. The defendants' only response to justify their refusal to leave is that their entry into Fontenot's home did not amount to a seizure violative of the Fourth Amendment. This argument misses the mark. The place of the intrusion, Fontenot's home, "is entitled to the strictest Fourth Amendment protection against unwarranted intrusions." *Wanger v. Bonner*, 621 F.2d 675, 682 (5th Cir. 1980). Under the circumstances present here, the deputies' mere presence in the home violated the Fourth Amendment, and they were therefore obligated to leave when instructed to do so.

Moreover, as explained above, there was ample evidence of an official show of authority on the part of the deputies to warrant the conclusion that Fontenot's liberty was restrained. In order for a seizure to occur, there must be a restraint of liberty accomplished by means of *either* physical force or the submission to the assertion of authority. *California v. Hodari D.*, __ U.S. __, 111 S.Ct. 1547, 1550-51 (1991). Here, the deputies' guns were drawn and pointed. They ordered Fontenot to give them immediate access to her home. They ignored her requests for them to leave her home. While the deputies may not have intended to restrain Fontenot's liberty in their efforts to locate Brandenburg, their conduct suggested otherwise. Further, Fontenot submitted to their show of authority when she did not physically resist the deputies or attempt to flee.

The magistrate judge was obligated to enter the judgment of the jury if reasonable persons could come to contrary conclusions

14

on the basis of the evidence presented at trial. *Molex, Inc.*, 759 F.2d at 478. For the reasons explained above, the evidence in this case did not mandate the conclusion that Fontenot voluntarily consented to the entry of her home or to any other restraint of her liberty. Since there was neither consent nor exigent circumstances to justify the deputies' conduct, their warrantless entry into Fontenot's home and subsequent refusals to leave were objectively unreasonable and violated the Fourth Amendment's proscription against unreasonable searches and seizures. We therefore reverse the magistrate judge's order granting judgment as a matter of law in favor of the defendants with respect to Fontenot's Section 1983 claim.

We are thus left to consider the propriety of the magistrate judge's order conditionally granting the defendants a new trial on Fontenot's Section 1983 claim. Orders granting or denying a new trial are reviewed under an abuse of discretion standard. *Allied Bank-West, N.A. v. Stein*, 996 F.2d 111, 115 (5th Cir. 1993). However, we will exercise "broad review" of a court's grant of a new trial" 'because of our respect for the jury as an institution and our concern that the party who persuaded the jury should not be stripped unfairly of a favorable decision.'" *Id., quoting Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988). An order granting a new trial will therefore be reversed when it is not supported by the reasons given, and the jury's findings are supported by evidence in the record. *Lloyd v. Georgia Gulf Corp.*, 961 F.2d 1190, 1196-97 (5th Cir. 1992).

Here, the magistrate judge did not explicitly state his reasons for conditionally granting a new trial. Further, we have already determined that the defendants are not entitled to judgment as a matter of law on the grounds of qualified immunity with regard to Fontenot's Section 1983 claims. We have also determined that there was adequate evidence in the record to support a finding that the defendants violated Fontenot's Fourth Amendment rights, which provides an adequate basis for liability under Section 1983. The magistrate judge's order conditionally granting a new trial is therefore reversed. We remand this case with instructions to reinstate the jury's verdict in favor of Fontenot and to render judgment in her favor.

AFFIRMED, IN PART, REVERSED, IN PART, AND REMANDED.