IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-20767
Summary Calendar
_____


LEO JACKSON,

                                    Plaintiff-Appellant,

v.

HOUSTON INDEPENDENT SCHOOL DISTRICT; PAUL PENA, JR,
Individually and in his Official Capacity as Assistant
Supervisor of Facilities, Grounds and Support Services,

                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas
(H-96-CV-4459)
_____

June 29, 1999

Before KING, Chief Judge, POLITZ and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

     Plaintiff-appellant Leo Jackson appeals the district court's

grant of summary judgment in favor of defendants-appellees

Houston Independent School District and Paul Peña, Jr. on his

Title VII and 42 U.S.C. § 1983 claims.  We affirm.

                    **I.  FACTUAL AND PROCEDURAL BACKGROUND**

     [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

At the time of the events giving rise to this lawsuit, plaintiff-appellant Leo Jackson, an African-American man, was employed by defendant-appellee Houston Independent School District ("HISD" or "the District") in its Facilities, Maintenance, and Operations Department ("FMO"), where he worked as a supervisor of FMO's small-engine repair shop. In January 1995, Jackson wanted to apply for the position of Operations Specialist for Support Services, but, he claims, that position was "downgraded in classification for racial purposes" and awarded without application or interview to Raul Cruz, a Hispanic man.

Jackson did apply for the position of Operations Manager I, and he was interviewed by a committee composed of defendant-appellee Paul Peña, Jr., who was Jackson's immediate supervisor, Al Thompson, and Bob Lucas. Although Peña gave Jackson the highest rating among all the applicants, Jackson did not receive a job offer. Instead, the committee hired José Noriega, a Hispanic male. After he learned of the committee's decision, Jackson filed an internal grievance contending that race had been a factor in the committee's failure to select him for the position. Shortly thereafter, in February 1995, Jackson requested that the Operations Foreman II position that he then held be reviewed and reclassified. Peña informed Jackson that such a review would take place once the District had hired a consulting company to conduct it. Soon afterward, the District engaged the Wyatt Company to carry out a reclassification study

2

of various District positions, and Jackson's position was reclassified as a result.

Jackson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") contending that he was denied certain promotions and refused a request for job reclassification because of his race. In addition, Jackson claimed that he suffered retaliation and deprivation of his constitutional rights to liberty and equal protection. The EEOC issued a right to sue notice on September 27, 1996, and on December 26, 1996, Jackson filed an action in the Southern District of Texas against the District and Peña (collectively, "the defendants") asserting claims for race discrimination and retaliation under 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII") and for the deprivation of his rights to liberty and equal protection under 42 U.S.C. § 1983. The district court granted summary judgment for the defendants on all of Jackson's claims. Jackson appeals.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same standards as the district court. See United States v. Johnson, 160 F.3d 1061, 1063 (5th Cir. 1998). After consulting applicable law in order to ascertain the material factual issues, we consider the evidence bearing on those issues, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the non-movant. See Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 214-15 (5th Cir.1998).

Summary judgment is properly granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).

### III.  DISCUSSION

On appeal, Jackson challenges the district court's grant of summary judgment on his Title VII and § 1983 claims.  We address each of his arguments in turn.

### A.  Title VII Race Discrimination Claim

Jackson alleges that the defendants[1] discriminated against him on the basis of his race by awarding the Operations Specialist for Support Services position to Cruz without an interview instead of allowing Jackson to apply; refusing to promote him to Operations Manager I; and failing promptly to review and reclassify the Operations Foreman II position.  Under the framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a Title VII plaintiff must first establish a prima facie case by a preponderance of the evidence.  See id. at 801-02.  A plaintiff may prove a prima

---

[1]  The defendants assert that Jackson has not provided any briefing regarding his Title VII claims against Peña and that he has therefore waived them.  Our reading of Jackson's brief reveals, however, that his arguments on his Title VII claims appear to refer to both the District and Peña, and we will therefore treat this appeal as challenging the district court's grant of summary judgment on Jackson's Title VII claims against both defendants.

facie case of discrimination by showing (1) that he is a member of a protected class, (2) that he sought and was qualified for an available employment position, (3) that he was rejected for that position, and (4) that the employer continued to seek applicants with the plaintiff's qualifications. See id. at 801. Once established, the prima facie case raises an inference of unlawful discrimination. See Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 254 (1981). The burden then shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. See McDonnell Douglas, 411 U.S. at 802. If the defendant comes forward with a reason which, if believed, would support a finding that the challenged action was nondiscriminatory, the inference of discrimination raised by the plaintiff's prima facie case drops from the case. See Burdine, 450 U.S. at 255 n.10. The focus then shifts to the ultimate question of whether the defendant intentionally discriminated against the plaintiff. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

We now apply these principles to the case before us. The parties appear to agree that Jackson made out a prima facie case of racial discrimination. To meet their burden of offering a legitimate, nondiscriminatory reason for their employment decisions, the defendants offered the following explanations. Cruz, they stated, was awarded the Operations Specialist for Support Services position without an interview because that job was filled administratively during a department reorganization

5

and reclassification conducted pursuant to official District procedure. As for the Operations Manager I position, the defendants explained that the selection committee collectively decided that Noriega was the best qualified candidate for the position. Finally, with respect to the delay in reviewing Jackson's Operations Foreman II position, the defendants averred that it was necessary to hire a consulting firm before Jackson's job could be evaluated. These explanations, if believed, would support a finding that the preference for Cruz and Noriega over Jackson and the defendants' failure promptly to review Jackson's position were legitimate and nondiscriminatory; the defendants thus have satisfied their burden of production. The defendants need not persuade us that they were actually motivated by these reasons; it is sufficient that they have raised a genuine issue of fact regarding whether they unlawfully discriminated against Jackson. See Williams v. Time Warner Operation, Inc., 98 F.3d 179, 181 (5th Cir. 1996) (citing Burdine, 450 U.S. at 254).

We now turn to the question of whether the defendants intentionally discriminated against Jackson on the basis of race. Jackson may satisfy his summary judgment burden by coming forward either with direct evidence of discriminatory intent or with circumstantial evidence that the defendants' rationale was pretextual. See LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 449 (5th Cir. 1996). We have articulated the test as follows:

> [A] jury issue will be presented and a plaintiff can avoid
> summary judgment . . . if the evidence taken as a whole
> (1) creates a fact issue as to whether each of the
> employer's stated reasons was what actually motivated the

6

employer and (2) creates a reasonable inference that [race] was a determinative factor in the actions of which plaintiff complains. The employer, of course, will be entitled to summary judgment if the evidence taken as a whole would not allow a jury to infer that the actual reason for the discharge was discriminatory.

Williams, 98 F.3d at 181 (first alteration in original) (quoting Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 995 (5th Cir. 1996) (en banc), an age discrimination case, and applying Rhodes in the race discrimination context).

Jackson points to portions of Peña's deposition testimony which he contends constitute either direct evidence of discriminatory intent or circumstantial evidence that the defendants' rationale for denying him the promotion and delaying him a job review was pretextual. Specifically, Peña admitted that he had received orders to "achieve a balance in the ethnicities":

Q. [By Jackson's counsel] Does your division try to achieve a balance in the ethnicities?
A. That's been our directive from our superiors.
Q. Could you repeat that, sir?
A. That has been a directive from my superiors.
Q. When was this directive from your superiors?
A. Through the years.

After Peña explained that Johnnie Tates, his immediate supervisor, had given an oral "ethnic balancing" directive some three to seven or eight times, most recently within the last six months, Jackson's counsel continued:

Q. What specifically did Mr. Tates say in this directive?
A. That we need to work toward balancing our work force with ethnicity and gender.
Q. Did he give any more detail about what he meant by that?
A. "Look at your makeup."
Q. When you say "look at your makeup," are you referring to the ethnic makeup?

7

```
A.  (Witness nodding head.)
Q.  After you've looked at your makeup, what are you
supposed to do in order to achieve this balance that Mr.
Tates has demanded?
A.  Nothing, if you don't have any vacancies.
Q.  And if you do have a vacancy?
A.  You advertise.
Q.  Where do you advertise?
A.  Through HR.
Q.  How does advertising through -- HR, you mean Human
Resources, correct?
A.  (Witness nodding head.)
Q.  How does advertising help get the balance that your
supervisors want?
A.  It doesn't.  You look for the best applicant for the
position.
```

Later in the deposition, Jackson's counsel asked whether Tates's racial balancing directive was irreconcilable with the statement on the District's personnel advertisements that positions were to be filled without regard to race or national origin.  Peña responded:

```
A.  The position should be filled that (indicating); but you
also need to look at the makeup, as he was telling us.  In
other words, don't perpetuate it if somebody is already
there.
Q.  What do you mean by that last comment, sir?  I don't
understand.
A.  Perpetuate?
Q.  Yes, sir.
A.  If you're out of balance, don't keep making it more out
of balance.
Q.  So that if you have too many African-Americans in a
particular division or department, you wouldn't want to put
another African-American in?
A.  I didn't say that.
Q.  How is that different from not perpetuating?
A.  I don't know how to do it.  I was never told how to do
it, so I never practiced it.
Q.  And you never asked how to do it?
A.  No.
```

In an affidavit signed some two weeks after his deposition, Peña averred: "Prior to the selection process for the Operations Manager position in 1995, I was directed by my supervisor, Mr.

8

Johnnie Tates, to ensure ethnic balancing in the various divisions throughout the department. I interpreted Mr. Tates [sic] directive as requiring that I ensure that discrimination was not a part of any employment decision in the department." The other two members of the selection committee stated in their affidavits that they neither received any directive to consider race or ethnicity nor did so during the application process for the Operations Manager I position.

Jackson has failed to raise a fact issue as to whether the defendants intentionally discriminated against him. The only evidence that race was a factor in any of the employment decisions concerning Jackson was Peña's testimony that his supervisor occasionally made somewhat ambiguous comments to the effect that "we need to work towards balancing our work force with ethnicity and gender." It is far from clear that this statement was intended or interpreted as an order to discriminate; indeed, Peña testified that, to the extent that he understood it at all, he took it to mean that he should not discriminate in his hiring decisions. Moreover, there is no evidence that the defendants discriminated on the basis of race with respect to any of the incidents of which Jackson complains. Peña testified, for example, that the District does nothing to achieve such ethnic balancing if there are no vacancies and that, if a vacancy arises, it advertises through the human resources department and offers the position to the best applicant. The other members of the Operations Manager I interview committee

9

stated unequivocally that race was not a factor in their decision. Jackson has adduced no more than a scintilla of evidence that the defendants' employment decisions with respect to him were racially motivated and, of course, such a mere scintilla of evidence is insufficient to defeat a motion for summary judgment. See Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986).

**B. Title VII Retaliation Claim**

Jackson also claims that the defendants unlawfully retaliated against him after he filed an internal grievance with the District. Specifically, he alleges that they denied him promotions and refused his requests that his position be reclassified, required him to perform an excessive number of status reports, refused him funds for necessary equipment for his department, and declined to assign him a new District vehicle to use in performing his duties.

Title VII provides in relevant part that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). A retaliation claim has three elements: (1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action. See Mattern v. Eastman Kodak Co., 104 F.3d 702, 705 (5th Cir. 1997).

10

The district court properly granted summary judgment for the defendants on Jackson's retaliation claims. Most of the retaliation Jackson alleges that he suffered does not rise to the level of an "adverse employment action." Title VII was designed to address only ultimate employment decisions and not "every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." Dollis v. Rubin, 77 F.3d 777, 781-82 (5th Cir. 1995). "Ultimate employment decisions" include acts "such as hiring, granting leave, discharging, promoting, and compensating," Mattern, 104 F.3d at 707, but not acts that are, at most, "'tangential' to future decisions that might be ultimate employment decisions," id. at 708. Such acts as an increased status report requirement and refusal to provide tools or a new vehicle are not ultimate employment decisions. Finally, although the alleged denials of promotional opportunities and an immediate reclassification are adverse employment actions, the record fails to show a causal connection between the filing of his grievance and these actions, and, in his brief to this court, Jackson ignores this element of his retaliation claim altogether.

## C. Section 1983 Claim Against the District

Jackson also claims that the District[2] is liable to him under 42 U.S.C. § 1983 because it deprived him of his rights to liberty and equal protection by categorizing him based on his

---

[2] We will discuss Jackson's § 1983 claims against the District and Peña separately because we dispose of them on different grounds.

race.  It is well-settled that a local governmental body such as the District is liable for damages under § 1983 for constitutional violations resulting from official policy or custom.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978).  A local government is responsible under § 1983 "when execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ."  Id. at 694.  A local government may not, however, be held liable under § 1983 for the unconstitutional acts of its non-policymaking employees; municipal liability cannot rest on a theory of respondeat superior.  See id. at 691.  This circuit has defined an official policy for whose execution a local government may be found liable as:

> . A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [district] . . . or by an official to whom the [district] ha[s] delegated policy-making authority; or

> . A persistent, widespread practice of [district] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [district] policy.  Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

Eugene v. Alief Indep. Sch. Dist., 65 F.3d 1299, 1304 (5th Cir. 1995) (alterations in original) (quoting Johnson v. Moore, 958 F.2d 92, 94 (5th Cir. 1992)).  Whether a particular entity has final policymaking authority is a question of state law, and the identification of those officials whose decisions represent the

12

official policy of the local governmental unit is a legal question to be resolved by the trial judge before the case is submitted to the jury. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989).

With these principles in mind, we turn to Jackson's claims against the District. Under Texas law, the board of trustees is responsible for determining school policy. See Gonzalez v. Ysleta Indep. Sch. Dist., 996 F.2d 745, 752 (5th Cir. 1993). Jackson has adduced no evidence whatsoever that his alleged injuries stemmed from an official policy promulgated by the board of trustees or from a persistent, widespread practice of District officials and employees of which the board had actual or constructive notice. Rather, he claims that Dr. Paige, the District's superintendent, gave Tates, who in turn passed the instruction to Peña, a directive regarding ethnic balancing, and that Paige's involvement subjects the District to liability. Jackson has produced no evidence, however, that the District's board of trustees delegated final policymaking authority to Paige. We therefore conclude that the District cannot be liable to Jackson under § 1983.

## D. Section 1983 Claim Against Peña

Finally, Jackson claims that Peña is liable to him under 42 U.S.C. § 1983 because Peña violated his rights to liberty and equal protection. Peña contends, however, that he is entitled to qualified immunity. Public officials acting within the scope of their official duties are shielded from civil liability by the

13

doctrine of qualified immunity. See Eugene, 65 F.3d at 1305 (citing Harlow v. Fitzgerald, 457 U.S. 800, 815-19 (1982)). Qualified immunity does not, however, shield a public official whose conduct violates clearly established constitutional rights, if a reasonable person would have known that such conduct was unconstitutional. See id. The examination of a claim of qualified immunity is a two-step inquiry. First, a court must determine whether the plaintiff has alleged a violation of a clearly established right. See Fontenot v. Cormier, 56 F.3d 669, 673 (5th Cir. 1995). Second, the court must decide whether the defendant's conduct was "objectively reasonable in light of the legal rules applicable at the time of the alleged violation." Id.

While Jackson has a clearly established right to be free from racial discrimination in employment, the evidence simply does not support the conclusion that Peña acted in an objectively unreasonable manner. The record does not demonstrate what connection, if any, Peña had to the decision to award Cruz the Operations Specialist for Support Services position. It does show that Peña rated Jackson highest among the finalists for the Operations Manager I position, that the interview panel collectively chose to recommend Noriega, and that Peña did not immediately review and reclassify Jackson's position because he wished to employ a consulting company to review all positions. As we explained above in Section III.A, Peña's deposition testimony--Jackson's only evidence that race was a factor in any

14

of the employment decisions of which he complains--does not so much as raise a fact issue as to whether Jackson was discriminated against on the basis of race.  Thus, Peña reasonably could have thought his actions to be consistent with the rights he allegedly violated, and he is therefore entitled to claim the defense of qualified immunity.

### IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

15